# EXHIBIT 4
# to Motion for Leave to File
# First Amended Complaint

**BEUS GILBERT McGRODER** PLLC

ATTORNEYS AT LAW
701 NORTH 44TH STREET
PHOENIX, ARIZONA  85008-6504
TELEPHONE (480) 429-3000

Leo R. Beus / 002687 / lbeus@beusgilbert.com
Michael K. Kelly / 014203 / mkelly@beusgilbert.com
Christine N. Jones / 018425 / cjones@beusgilbert.com
Daniel J. Anderson / 030338 / danderson@beusgilbert.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Swarm Technology, LLC, an Arizona limited liability company, | Case No.: CV-21-00438-PHX-DJH |
| Plaintiff, | **DECLARATION OF DR. DOUGLAS J. SYLVESTER IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT** |
| v. | |
| Amazon.com, Inc., and Amazon Web Services, Inc., | |
| Defendants. | |

I, Douglas J. Sylvester, declare as follows:

## BACKGROUND AND QUALIFICATIONS

1.      I am a Professor of Law and former Law School Dean at the Sandra Day O'Connor College of Law at Arizona State University where my work continues to focus on computers, nanotechnology, intellectual property law, and particularly patent law, innovation, and the incubation and commercialization of inventors and inventions.

(842116.1)

2.     A detailed record of my professional qualifications is set forth in my *curriculum vitae* attached to this Declaration as **Exhibit A.** Exemplary professional highlights from my *curriculum vitae* which are relevant to this proceeding include:

Appointments and Employment

- Dean, Sandra Day O'Connor College of Law at Arizona State University, March 2012 – 2021
- Professor of Law, Sandra Day O'Connor College of Law at Arizona State University, July 2006 - present
- Senior Fellow, Center for Nanotechnology in Society, Arizona State University, 2004 - present
- Lecturer-in-Law, Northwestern University School of Law, 2000-2001
- Lecturer-in-Law, University of Chicago Law School, 1999-2001

Publications

- *Who Invented the Computer?* 44 Jurimetrics 367-84 (2004) [review essay of Alice Rowe Burks, *Who Invented the Computer? The Legal Battle That Changed Computing*]
- *Navigating the Patent Landscapes for Nanotechnology: English Gardens or Tangled Grounds? 2016 Update* in Methods in Molecular Biology-Patent Landscapes 2016 (edited volume) (Springer, 2016) [with Dr. Diana Bowman]
- Entrepreneur's Guide to Innovation Law (2005) (prepared for Arizona State University Technopolis Program) (with Prof. Eric Menkhus & Kari A. Granville)                         (available                         at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=999451)

Courses Taught

- Intellectual Property and Innovation (W.P. Carey School of Business, Executive MBA. Spring 2009, Spring 2010, Spring 2017)

- Introduction to Intellectual Property, ASU College of Law (Fall 2005, Fall 2006, Fall 2007, Fall 2008, Spring 2010, Spring 2011, Spring 2012, Spring 2017)
- Intellectual Property Commercialization & Technology Transfer, ASU College of Law (Fall 2003, 2004, 2005)

Guest Lectures and Presentations

- Lecture, "Patents and Technology Transfer," Science, Technology & Public Affairs (Mar. 2006, Mar. 2009, May 2010, April 2011) [course co-taught by Pres. Michael Crow and Prof. Daniel Sarewitz]
- Presenter, "Patents and Patentability," Institute of Electrical and Electronics Engineers Society, DeVry University, Phoenix (Dec. 2005)

Legal Consulting

- Special Consultant, National Academies of Science, Committee on National Statistics (September 2007-December 2009) [Census Bureau Dynamics of Well-Being System Proposal]
- Consultant, (Vioxx-related litigation, 2006) [patents, licensing, trade secrets, biotechnology]
- Arizona Technopolis, Phoenix, AZ (2003-Present) [organization committed to the education and incubation of inventors and inventions in Arizona]
- Expert Witness, (*Farnam v. Stabar*, 2005) [patent interpretation, licensing, trade secrets].

3.      I have been retained on behalf of Plaintiff Swarm Technology, LLC ("Swarm" or "Plaintiff") to provide a declaration in connection with the above-captioned litigation. Swarm has asked me to review U.S. Patent No. 9,146,777 (the '777 patent), U.S. Patent No. 9,852,004 (the '004 patent) and U.S. Patent No. 10,592,275 (the '275 patent) (collectively the "Patents-in-Suit").

4.     Although I am well versed in patent law and an experienced patent law professional, I do not provide any opinions or guidance to this Court on matters of law. Rather, my observations, conclusions, and opinions are limited to the factual issues recited herein.

5.     I have reviewed the Patents-in-Suit, Plaintiff's First Amended Complaint, Plaintiff's Motion for Leave to File its First Amended Complaint (the "Motion"), and the Declaration of Dr. Brent Nelson in Support of the Motion.

6.     In particular, I understand and concur with each and every statement contained in the accompanying Declaration of Dr. Brent Nelson (submitted herewith).

7.     Based on my review of the foregoing documents, and my education and experience, it is my opinion that while computing components, architectures, and processes can always be described using analogies to humans and human activities, the existence of such analogies does not imply that all such computing components, architectures, and processes are directed to organizing human activities.

8.     Based on my review of the foregoing documents, and my education and experience, including my review of MPEP § 2106, it is my opinion that the Patents-in-Suit are not directed at methods of organizing human activity such as fundamental economic principles or practices (including hedging, insurance, mitigating risk); commercial or legal interactions (including agreements in the form of contracts; legal obligations; advertising, marketing or sales activities or behaviors; business relations); managing personal behavior or relationships or interactions between people (including social activities, teaching, and following rules or instructions).

9.     Based on my review of the foregoing documents, and my education and experience, it is my opinion that many of the claimed elements and features, both individually and in combination, are directed at non-abstract improvements in computing memory, architectures, and processes.

10.     Based on my review of the foregoing documents, and my education and experience, it is my opinion that while generic computers could be used to more efficiently

organize and manage teams of humans and their combined efforts, the multiprocessor systems claimed by the Patents-in-Suit are directed to far more specific and complex problems that are unique to computing environments. Said differently, the claimed elements and features do far more than apply computers to a pre-existing human process or practice. These claimed elements and features substantially improve upon pre-existing computing architectures, memory, and processing and may be applied in myriad technological applications.

11.    Based on my review of the foregoing documents, and my education and experience, it is my opinion that many of the claimed elements and features, both individually and in combination, enable computers to operate faster and more efficiently, and to better exploit available computational resources. Furthermore, the claimed elements and features, both individually and in combination, improve multiprocessor system flexibility and fault-tolerance, and are directed at specific technological improvements that are non-abstract.

12.    Based on my review of the foregoing documents, and my education and experience, it is my opinion that many of the claimed elements and features, both individually and in combination, embody inventive concepts in that they were not well-understood, routine, or conventional at the time of the Patents-in-Suit were filed.

13.    It is also my opinion, based on my review of the foregoing documents and my education and experience, that the claimed subject matter represents improvements to the operation and functionality of multiprocessor systems. That is, the claims are not simply directed to generic computer systems; rather, the claimed multiprocessor systems override routine and conventional processing.

14.    It is also my opinion, based on my review of the foregoing documents and my education and experience, that the non-conventional arrangement of the claimed elements comprise technical improvements over the prior art, and thus include inventive concepts.

15.    It is also my opinion, based on my review of the foregoing documents and my education and experience, that the claimed inventions are directed to improvements in efficiency and processing capacity over conventional system architectures.

16.     This declaration is based on my own personal knowledge. I make this declaration in support of Plaintiff's Motion for Leave to File First Amended Complaint for Patent Infringement.

## THE '004 PATENT

17.     It is my opinion, based on my review of the foregoing documents and my education and experience, that the '004 specification correctly points out that a conventional "multiprocessor system includes a central processing unit ("CPU") and one or more co-processors. The CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Completed threads are reported to the CPU, which continues to distribute additional threads to the co-processors as needed." '004 Patent, 1:56-61.

18.     It is my opinion, based on my review of the foregoing documents and my education and experience, such a conventional multiprocessor system suffers from certain technological drawbacks. The '004 specification rightly identifies that a "significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors." '004 Patent, 1:63-2:1.

19.     It is my opinion, based on my review of the foregoing documents and my education and experience, that claim 1 of the '004 Patent describes an unconventional multiprocessor system wherein "a controller" is "configured to populate [a] task pool with a plurality of first tasks and a plurality of second tasks …." '004 Patent, 14:12-13. Claim 1 goes on to describe a first co-processor that is configured to "retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller …." '004 Patent, 14:14-19. Claim 1 describes a second co-processor similar to the first co-processor. The '004 Patent specification supports the controller described by claim 1, describing one embodiment where "the CPU 11 may be

configured for use within the system 10 by programming it to recognize and communicate with the task pool 13 and divide the computing requirements into threads …." '004 Patent, 5:40-43.

20.    It is my opinion, based on my review of the foregoing documents and my education and experience, that by using the task pool as an intermediary device between the controller and the co-processors, the elements of claim 1, both individually and as a combination, specifically prevent and override the routine and conventional sequence of events performed by conventional processing architectures. As a result, Claim 1's improvements to multiprocessor functionality can achieve benefits such as "reducing CPU overhead by relieving the CPU of the need to send a request to a cell to retrieve a task from the task pool." '004 Patent, 8:67-9:2. In view of the foregoing, it is my opinion, based on my expertise, that claim 1 of the '004 Patent includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry.

21.    It is my opinion, based on my review of the foregoing documents and my education and experience, that the '004 Patent specification correctly points out that, in a conventional multiprocessor system, the "co-processors often remain idle while waiting for a new task from the CPU." '004 Patent, 2:1-3. This characterization is correct, because conventionally co-processors are subordinate secondary devices which wait for operative directions from a controller such as a CPU. Such a conventional system fails to fully "harness[] and exploit[] available co-processing resources." '004 Patent, 2:6-7.

22.    It is my opinion, based on my review of the foregoing documents and my education and experience, that claim 1 of the '004 Patent describes unconventional co-processors such as a "a first co-processor configured to … retrieve a first task from the task pool … process the first task … and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and a second co-processor configured to … retrieve a second task from the task pool … process the second task … and update the task pool to reflect completion of the second task, all without any

communication between the second co-processor and the controller …." '004 Patent, 14:14-27. The '004 Patent specification supports the co-processors recited in claim 1, describing embodiments where the co-processors are "capable of acting autonomously; that is, they may interact with the task pool independently of the CPU." '004 Patent, 2:20-22. The co-processor is also described in an embodiment as "proactive, in that it obtains a task to perform by sending its agent to the task pool when the solidarity cell [co-processor] has no processing to perform or, alternatively, when the solidarity cell [co-processor] is able to contribute processing cycles without impeding its normal operation." '004 Patent, 2:67 – 3:4.

23.    It is my opinion, based on my review of the foregoing documents and my education and experience, that because the first and second co-processors are specifically programmed to retrieve their respective tasks from the task pool, and subsequently update the task pool after completing their respective tasks, without directly communicating with the controller, the elements of claim 1, both individually and in combination, specifically prevent and override the routine and conventional sequence of events performed by conventional processing architectures.

24.    In my opinion, based on my review of the foregoing documents and my education and experience, claim 1's improvements to multiprocessor functionality can achieve the benefit that "the processing capacity of the solidarity cells [co-processors] may be more fully exploited …," '004 Patent, 8:64-65, which "render[s] the system [] more efficient than traditional computer architectures in which auxiliary modules and co-processors are dependent on instructions from the main CPU." '004 Patent, 9:2-5. In view of the foregoing, it is my opinion that claim 1 of the '004 Patent includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry.

25.    In my opinion, claims 4 and 5 of the '004 Patent include inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry, including inventive concepts similar to those identified in relation to claim 1. For example, claim 4 is directed to a processing system "wherein the controller and the task

pool reside on a *monolithic integrated circuit* (IC), and the first and second co-processors do not reside on the IC," '004 Patent, 15:37-40 (emphasis added), and claim 5 is directed to a processing system "wherein the controller, the task pool, and the first and second co-processors reside on a single monolithic integrated circuit (IC)." '004 Patent, 16:1-3. In view of the foregoing, it is my opinion that claims 4 and 5 of the '004 Patent are directed to non-abstract, inventive concepts that include a chip architecture.

26.     In my opinion, based on my review of the foregoing documents and my education and experience, claim 6 of the '004 Patent includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry. For example, claim 6 is directed to a processing system "wherein the first and second devices each comprise one of a sensor, light bulb, power switch, appliance, biometric device, medical device, diagnostic device, lap top, tablet, smartphone, motor controller, and security device." '004 Patent, 16:7-11.

## THE '275 PATENT

27.     In my opinion, based on my review of the foregoing documents and my education and experience, the '275 specification correctly points out that a conventional "multiprocessor system includes a central processing unit ("CPU") and one or more co-processors. The CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Completed threads are reported to the CPU, which continues to distribute additional threads to the co-processors as needed." '275 Patent, 1:63-2:1.

28.     In my opinion, based on my review of the foregoing documents and my education and experience, such a conventional multiprocessor system suffers from technological drawbacks. The '275 Patent specification rightly identifies that a "significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages

from co-processors. In addition, co-processors often remain idle while waiting for a new task from the CPU." '275 Patent, 2:3-10.

29.    In my opinion, based on my review of the foregoing documents and my education and experience, claim 1 of the '275 Patent describes an unconventional multiprocessor system comprising "a task pool" to which "a controller" is configured to populate "a plurality of first tasks and a plurality of second tasks" and from which "a first co-processor" and "a second co-processor" are configured to "retrieve" a "first task" and a "second task," respectively, all "without any communication between the [] co-processor[s] and the controller …." '275 Patent, 14:25-39. The '275 Patent specification supports the elements described in claim 1, describing various embodiments where "a parallel processing computing architecture include[s] a CPU configured to populate a task pool, and one or more co-processors configured to proactively retrieve threads (tasks) from the task pool. Each co-processor notifies the task pool upon completion of a task, and pings the task pool until another task becomes available for processing. In this way, the CPU communicates directly with the task pool, and communicates indirectly with the co-processors through the task pool." '275 Patent, 2:19-27.

30.    In my opinion, based on my review of the foregoing documents and my education and experience, by using the task pool as an intermediary device between the controller and the co-processors, the elements of claim 1, both individually and as a combination, specifically prevent and override the routine and conventional sequence of events performed by conventional processing architectures. Claim 1's improvements to multiprocessor functionality can achieve benefits such that "the processing capacity of the solidarity cells [co-processors] may be more fully exploited, inasmuch as the cells need not wait idly for an instruction from the CPU []," '275 Patent, 9:12-13, and "reducing CPU overhead by relieving the CPU of the need to send a request to a cell to retrieve a task from the task pool." '275 Patent, 9:15-17. In view of the foregoing, it is my opinion that claim 1 of

the '275 Patent includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry.

31.    In my opinion, based on my review of the foregoing documents and my education and experience, claim 1 of the '275 Patent includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry.  For example, each co-processor may be configured to retrieve a task by sending its agent to the task pool when the co-processor is idle or otherwise able to contribute processing cycles without impeding its normal operation. In this context, "the term agent refers to a software module, analogous to a network packet, associated with a co-processor that interacts with the task pool to obtain tasks which are appropriate for that co-processor cell." '275 Patent; 3:21-24.  Humans are not capable of performing tasks such as transmitting a network packet from a co-processor to a data structure (e.g., task pool), as those tasks are specific to computer operation.

32.    In my opinion, based on my review of the foregoing documents and my education and experience, claim 1 of the '275 Patent includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry. For example, the "collaborative intelligence system" of claim 1 may include a configuration where co-processors can by "dynamically accept[ed]" on a "plug-and-play basis without any communication with the controller …." '275 Patent, 14:41-44. Such an unconventional system would benefit from efficiencies gained by dynamic system capacity growth, as well as system flexibility and adaptability to computational demands.

33.    In my opinion, based on my review of the foregoing documents and my education and experience, conventional multiprocessor systems would not accept and utilize new co-processors being added to the system without first communicating with a controller (e.g. via a notification/interruption) to enable the controller to recognize and direct the new co-processor within the system. Conventional approaches are disadvantageous because they place a burden on the controller every time a new co-processor is added to the system. The

burden reduces system efficiency.  Relieving the burden would improve and enhance existing systems.

34.    In my opinion, based on my review of the foregoing documents and my education and experience, claim 1 of the '275 includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry. For example, the "collaborative intelligence system" of claim 1 may include a configuration where co-processors can by "dynamically accept[ed]" on a "plug-and-play basis without any communication with the controller …." '275, 14:41-44. Such an unconventional system would benefit from efficiencies gained by system capacity growth, as well as system flexibility and adaptability to computational demands.

35.    In my opinion, based on my review of the foregoing documents and my education and experience, claim 1 of the '275 patent, claim 1 of the '275 Patent includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry.  For example, the system may include a plurality of cells, wherein some of the cells are capable of performing the same task types as other cells, to thereby create redundancy in the system. This redundancy allows the system to continue functioning seamlessly when cells are removed from the system or are otherwise unavailable (such as due to component failures).  This creates a fault-tolerant system, thereby making the system more reliable and robust than conventional systems. Conversely, the system also functions seamlessly when cells are dynamically added to the system. *See e.g.*, '275 Patent, 6:49-7:2. To my knowledge, these inventive concepts had never been proposed before Swarm invented them, and therefore it is my opinion that the inventive concepts were not well-understood, routine, or conventional at the time of the Patents-in-Suit.

36.    In my opinion, based on my review of the foregoing documents and my education and experience, claim 4 of the '275 Patent includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry.  For example, claim 4 is directed to a collaborative processing system "wherein the

first co-processor is configured to determine when it has available processing capacity, and to dispatch the first agent to the task pool in response to the determination." '275 Patent, 14:67-15:3.

37.     In my opinion, based on my review of the foregoing documents and my education and experience, claim 5 of the '275 Patent includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry.  For example, claim 5 is directed to a collaborative processing system "wherein the controller and the task pool reside on a monolithic integrated circuit (IC) that is not a component of either the first or second co-processors." '275 Patent, 15:5-7.

38.     In my opinion, based on my review of the foregoing documents and my education and experience, claim 16 of the '275 Patent includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry.  For example, claim 16 is directed to a collaborative processing system "wherein the plurality of autonomous co-processors retrieve the tasks from the task pool via a wireless data connection." '275 Patent, 16:57-59. This enables the creation of unique multiprocessing architectures where the controller and coprocessors are not necessarily located within the same chip, board, or system assembly.  As such, it allows processing power to be harnessed from both near and distant coprocessors.  It further allows systems to be augmented with additional coprocessors after deployment, something not as easily done with conventional systems.  As a result, the described systems provide much more flexibility in terms of the types of multiprocessor systems that can be built based on the inventive concepts mentioned in the '275 Patent.

## THE '777 PATENT

39.     In my opinion, based on my review of the foregoing documents and my education and experience, claim 1 of the '777 Patent includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry.  For example, claim 1 comprises a task pool in electronic communication with the

CPU and a first solidarity cell in electronic communication with the task pool.  Humans are not capable of electronically communicating with microelectronic devices; rather, such electronic communication is the exclusive domain of computers and computer networks.

40.     In my opinion, based on my review of the foregoing documents and my education and experience, the '777 specification correctly points out that in a conventional multiprocessor system, a "co-processor will remain idle as it waits for a thread to be assigned to it by the CPU." '777 Patent, 1:41-42. This characterization is correct, because such conventional co-processors are subordinate secondary devices which wait for operative directions from a controller such as a CPU. Such a conventional system fails to efficiently allocate and utilize its processing resources.

41.     In my opinion, based on my review of the foregoing documents and my education and experience, claim 1 of the '777 Patent describes unconventional functionality of co-processors such as a "first solidarity cell comprising a first agent configured to proactively retrieve, from the task pool, without requiring an instruction from the CPU, a matching task for the solidarity cell to process …." '777 Patent, 7:46-49. The '777 Patent specification supports the co-processors described by claim 1, describing embodiments where co-processors (solidarity cells) "act autonomously in that they may act independently of the CPU 11 or any other co-processor. In particular, the cells 12A . . . n do not require an instruction from the CPU 11 to act. The cells 12A . . . n act proactively in that they seek a task 22 from the task pool 13 as soon as the cells 12A . . . n become available to do further processing." '777 Patent, 5:19-25.

42.     In my opinion, based on my review of the foregoing documents and my education and experience, claim 1's improvements to multiprocessor systems can achieve the benefit that the processing capacity of the co-processors is more fully exploited which renders "the system [] more efficient than traditional computer architectures in which auxiliary modules and co-processors are dependent on instructions from the main CPU." '777 Patent, 5:67-6:3. In view of the foregoing, it is my opinion that claim 1 of the '777 Patent includes

inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry.

43.     In my opinion, based on my review of the foregoing documents and my education and experience, claim 1 of the '777 Patent includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry.  For example, the solidarity cell is equipped with a software agent to retrieve a matching task from the task pool, without directly communicating with the CPU.

44.     In my opinion, based on my review of the foregoing documents and my education and experience, claim 9 of the '777 Patent includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry.  For example, claim 9 is directed to an apparatus "wherein the descriptor is a data structure and the task contains a reference to the memory location of the descriptor." '777 Patent, 8:35-37.

45.     In my opinion, based on my review of the foregoing documents and my education and experience, claim 10 of the '777 Patent includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry.  For example, claim 10 is directed to an apparatus "wherein the task pool occupies a region of physical memory." '777 Patent, 8:38-39.

I hereby declare under penalty of perjury that the foregoing statements are true to the best of my knowledge.

Executed this 20th day of October 2021.

By_____

Douglas J. Sylvester

# EXHIBIT A
# to Declaration of
# Dr. Douglas Sylvester

10/8/2021

# DOUGLAS J. SYLVESTER

Sandra Day O'Connor College of Law at Arizona State University •
111 East Taylor Street • Phoenix, Arizona 85004 •
Phone: (480) 965-6188 • Fax: (480) 965-2427 •
e-mail: douglas.sylvester@asu.edu

## APPOINTMENTS AND EMPLOYMENT

Dean, March 2012-present
Interim Dean, May 2011-February 2012
Associate Dean for Faculty Research and Development, 2008-May 2011
Professor of Law, July 2006-present
Associate Professor, July 2002-June 2006
Sandra Day O'Connor College of Law at Arizona State University

Affiliated Professor, 2003-present
W.P. Carey School of Business, Arizona State University

Faculty Fellow, 2009-present
Center for Law and Global Affairs, Arizona State University

Faculty Fellow, 2002-present
Center for the Study of Law, Science & Technology, Arizona State University

Senior Fellow, 2004-present
Center for Nanotechnology in Society, Arizona State University

Attorney, 2000-2002
Baker & McKenzie, Global e-Commerce Practice Group

Lecturer-in-Law, 2000-2001
Northwestern University School of Law

Lecturer-in-Law, 1999-2001
University of Chicago Law School

Bigelow Fellow & Lecturer-in-Law, 1997-1999
University of Chicago Law School

Law Clerk, 1995-1997
United States District Court for the Southern District of Florida
(Hon. C. Clyde Atkins) (*d.*)

10/8/2021

## EDUCATION

New York University School of Law
LL.M., 1995 (c. 1998)
Member of Legal History and International Law Faculty Colloquia

University of Buffalo School of Law
J.D., *cum laude*, 1994
Buffalo Law Review (Executive Editor);
Jessup Moot Court (Best Oralist, Niagara Jessup Competition, Competitions Dir., National Moot Coach)

University of Toronto
B.A. Honours (4-year degree) (History Specialist), 1991

## ARTICLES AND ESSAYS

*Targeting Decisions and Consequences for Civilians in the Colombian Civil Strife*, 27 MINN.J.INT'L L. 501 (2017) (with Aaron X. Fellmeth)

*International Harmonization of Regulation of Nanomedicine,* 3 STUDIES IN ETHICS, L. & SOC'Y 1-18 (2010) [with Abbott, Marchant & Danforth]

*A New Soft Law Approach to Nanotechnology Oversight: A Voluntary Product Certification Scheme,* 28 UCLA J. ENV'T L. & POL'Y 123-53 (2010) [with Abbott & Marchant]

*What Does the History of Technology Regulation Teach Us About Nano Oversight?,* 37 J. LAW, MEDICINE & ETHICS 724-731 (2010) [with Abbott & Marchant] [peer review]

*Not Again! Public Perception, Regulation, and Nanotechnology*, 3 REGULATION AND GOVERNANCE 165-185 (2009) [with Abbott & Marchant] [peer review]

*A Framework Convention for Nanotechnology?: Policy Review* 38 ENV. L. REP. 10507-14 (2008) [with Abbott & Marchant]

*Risk Management Models for Nanotechnology,* 2 NANOETHICS 43-60 (2008) [with Abbott & Marchant] [peer review]

*Rule Violations and the Rule of Law: A Factorial Survey of Public Attitudes*, 56 DEPAUL L. REV. 615-638 (2007) [invited symposium] [with Dr. Michael Saks and Nicholas Schweitzer]

*A Framework Convention for Nanotechnology?* 36 ENV. L. REP. 10931-42 (2006) [with Prof. Kenneth Abbott & Marchant]

*Transnational Models For Regulation of Nanotechnology,* 34 J. LAW, MEDICINE & ETHICS 714-25 (2006)  [with Dr. Gary Marchant] [peer review]

*United States Approaches to Trademark Law in Cyberspace*, 5 JURISPRUDENCIJA 20-28 (2006) [invited symposium] [law journal of Mykolo Romero Universitetas, Vilnius, Lithuania]

*Counting on Confidentiality: Legal and Statistical Approaches to Federal Privacy Law After the USA PATRIOT Act*, 2005 WISC. L. REV. 1036-1138 (2005) [with Dr. Sharon Lohr]

*The Security of Our Secrets: A History of Privacy and Confidentiality in Law and Statistical Practice* 83 DENV. U. L. REV. 147-209 (2005) [with Dr. Sharon Lohr]

*Who Invented the Computer?* 44 JURIMETRICS 367-84 (2004) [review essay of Alice Rowe Burks, *Who Invented the Computer? The Legal Battle That Changed Computing*]

*Cyberspace Carcassonne: Nihilism and Normativity in Cyberspace Regulation,* 43 JURIMETRICS 369-86 (2003) [review essay of Stuart Biegel, *Beyond Our Control? Confronting the Limits of Our Legal System in the Age of Cyberspace*]

*Myth in Restorative Justice History,* 2003 UTAH L. REV. 1445-96 (2003) [invited symposium]

*Beyond Breard*, 17 BERKELEY J. INT'L L. 147-192 (1999) [with Prof. Erik G. Luna] (cited in U.S. v. Jiminez-Nava, 243 F.3d 192, 198-99 (5th Cir. 2001) (J. E. Jones))

*International Law as Sword or Shield? Early American Foreign Policy and the Law of Nations*, 32 NYU J. INT'L L. & POL. 1-87 (1999) (cited in Sarei v. Rio Tinto, PLC, 671 F.3d 736 (9th Cir. 2011) (Ikuta, dissenting)).

Comment: *Customary International Law, Forcible Abductions and America's "Return to the Savage State"* 42 BUFF. L. REV. 555-620 (1994)

## BOOKS & CHAPTERS

*Navigating the Patent Landscapes for Nanotechnology: English Gardens or Tangled Grounds? 2016 Update* in METHODS IN MOLECULAR BIOLOGY-PATENT LANDSCAPES 2016 (edited volume) (Springer, 2016) [with Dr. Diana Bowman]

*International Harmonization of Nanotechnology Oversight*, in THE NANOTECHNOLOGY CHALLENGE: CREATING LAW AND LEGAL INSTITUTIONS FOR UNCERTAIN RISKS (edited volume) [with Marchant, Abbott & Lynn Gulley] Cambridge University Press, 2012).

*Navigating the Patent Landscapes for Nanotechnology: English Gardens or Tangled Grounds*? in METHODS IN MOLECULAR BIOLOGY-PATENT LANDSCAPES (edited volume) (Springer, 2010) [with Dr. Diana Bowman]

10/8/2021

*Transnational Regulation of Nanotechnology: Reality or Romanticism?* in INTERNATIONAL HANDBOOK ON REGULATING NANOTECHNOLOGIES 25-55 (Graeme Hodge & Diana Bowman, eds, Edward Elgar) (2010) [with Abbott & Marchant]

*Nanotechnology Regulation: The United States Approach* in NEW GLOBAL FRONTIERS IN REGULATION 189-212 (Graeme Hodge, Diana Bowman, & Karinne Ludlow, eds., 2007: Edward Elgar) [with Abbott & Marchant]

*The Lessons of Nuremberg and the Trial of Saddam Hussein* in EVIL, LAW & THE STATE: PERSPECTIVES ON STATE POWER AND VIOLENCE, 127-41 (John M. Parry, ed., 2006) (available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=789984) (one of only seven presentations selected, by attendees, for preparation as published paper)

ENTREPRENEUR'S GUIDE TO INNOVATION LAW (2005) (prepared for Arizona State University Technopolis Program) (with Prof. Eric Menkhus & Kari A. Granville) (available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=999451)

*Legal Pageantry and Derogation of Due Process Norms in the Trial of Saddam Hussein,* in EVIL, LAW & THE STATE: CONFERENCE PROCEEDINGS (Dr. Robert Fisher, ed. 2007)) [e-book conference proceedings) (available at http://papers.ssrn.com/abstract=942451)

*The Law of Online Privacy*, in INTERNET AND E-COMMERCE *Law,* 15: 1-55 (Andre C. Frieden, ed. 2002) (with Neil B. Hayes) [winner of "Best Publication"—Association for Continuing Legal Education 2002) (available at

## WORKS-IN-PROGRESS & UNPUBLISHED ARTICLES

*Targeting Decisions and Consequences for Civilians in the Colombian Civil Strife* [with Prof. Aaron X. Fellmeth] (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1656476)

*International Regulatory Regimes for Nanotechnology* [with Profs. Kenneth Abbott, Gary Marchant & Sandeep Gopalan] [available at http://papers.ssrn.com/abstract=907353]

## MEDIA PUBLICATIONS & OTHER WRITINGS

*Evolving Custom in the Laws of War: An Empirical Investigation of Proportionality in Internal Conflicts,* 16(2) Will. J. of Int'l L. & Disp. Resol. 368 (2010) [transcript of conference presentation]

10/8/2021

*Entries in* ENCYCLOPEDIA OF AMERICAN CIVIL LIBERTIES (Paul Finkelman ed., Routledge Press, forthcoming 2006)

- Fair Credit Reporting Act of 1970
- Video Privacy Protection Act of 1988
- Privacy Protection Act of 1980
- Congressional Protection of Privacy

*Legal Pageantry and Derogation of Due Process Norms in the Trial of Saddam Hussein (Conference Presentation Paper) available at* http://www.wickedness.net/els/els1/sylvester%20paper.pdf

*Privacy Costs*, ASU FORUM (Dec. 2003)

Baker & McKenzie*, E-Commerce Practice Manual* (2002) [contributor]

Column for online CHICAGO TRIBUNE (http://www.chicagotribune.com/tech)

- "All Things Trademark: Co-Branding" (Feb. 16, 2001)
- "To Know Spam is to No Spam" (Feb. 19, 2001)
- "Pay Attention to Privacy" (Feb. 26, 2001)
- "Why International Privacy Matters" (Feb. 28, 2001)
  - Columns have been reprinted in various online journals, including, the ORLANDO SENTINEL, SOUTH FLORIDA SUN-SENTINEL, BALTIMORE SUN, BLACKVOICES.COM, HARTFORD COURANT, and NEWSDAY.COM

*Court Throws Mud On Adobe Argument in Software Dispute*, CHIC. LAWYER (Dec. 1, 2001)

## **LEGAL CONSULTING**

Special Consultant, National Academies of Science, Committee on National Statistics (September 2007-December 2009) [Census Bureau Dynamics of Well-Being System Proposal]

Consultant, (Vioxx-related litigation, 2006) [patents, licensing, trade secrets, biotechnology]

Testifying Expert Witness, (*Farnam v. Stabar*, 2005) [intellectual property, licensing, trade secrets]

Technology Mentor (2004-present) [volunteer mentoring of students in various technology competitions]

Arizona Technopolis, Phoenix, AZ (2003-Present) [organization committed to the education and incubation of inventors and inventions in Arizona]

Midwestern University Medical School, Glendale, AZ & Peoria, Illinois (2003 & 2004) [faculty IP policies & technology transfer]

10/8/2021

## FUNDED AND UNFUNDED GRANT APPLICATIONS

*Mechanisms for Transnational Coordination and Harmonization of Nanotechnology Governance in Support of Bioenergy Development* (Dep't of Energy Grant) (**funded**, September 2010) [co-PI with Marchant & Abbott] [$270,000].

*Mechanisms for Transnational Coordination and Harmonization of Nanotechnology Governance in Support of Bioenergy Development* (Dep't of Energy Grant) (**funded**, September 2007) [co-PI with Marchant & Abbott] [$310,000].

*International Regulation of Nanotechnology* (NSF Grant) (submitted Feb. 2006) [co-PI with Marchant and Abbott]

*International Intellectual Property and Barriers to Genomic Research* (NSF Grant) (submitted Oct. 2004) [Dr. Dennis Karjala, PI]

*Negotiating Border Order* (ASU Grant, **funded** Apr. 2004) [Dr. Michael Musheno, PI]

*Cyberspace Ethics* (NSF Grant) (submitted 2002) [Dr. Forouzan Golshani, PI]

## ACADEMIC & PROFESSIONAL SERVICE

Board of Governors (*ex officio*), State Bar of Arizona (Summer 2011-Present)

Board Member, Central Arizona Services Shelter (2012-2018)

Board Member, Phoenix Council on Foreign Relations (Fall 2012-Present)

Chair, Appointments Committee, ASU College of Law (Spring 2006, 2006-2007, 2010-11)

Member, Tenure & Promotion Committee (2010-11)

Chair, Web Redesign Committee (2009-2010)

Editor, Risk, Regulation, and Policy (SSRN e-Journal) (2009-2016)

Member, Center for Nanotechnology in Society, ASU [2004-Present]

Referee, *Text and Performance Quarterly* (2012)

Referee, *Journal of Risk, Regulation, and Governance* (2009-present)

Referee, *Journal of Politics* (2008-present)

Referee, *Environmental Management* (2007-present)

Referee, *Jurimetrics* (2002-present)

Chair, Curriculum Committee, ASU College of Law (2007-08)

Chair, International Studies Committee, ASU College of Law (2002-2004, 2007-2008)

Member, Appointments Committee, ASU College of Law (2005-2006, 2008-2010)

Ira A. Fulton School of Engineering, Office of Entrepreneurial Programs, Advisory Board (2005-2007)

Member, LL.M. in Biotechnology and Genomics Committees on Admissions and Curriculum (2004-2011)

10/8/2021

Arizona Technology Enterprises, Technology Ventures Clinic Advisory Board, (2003-2009)

ASU Entrepreneurship 2004, Board of Directors, Competition Advisor, and Judge (2003-2004)

Member, Law, Science, and Innovation Center Advisory Committee, ASU College of Law (2002-Present)

Faculty Advisor, Legal Alchemy and Entrepreneurship, ASU College of Law (2004-2005)

Faculty Advisor, Student Association for International Law, ASU College of Law (2002-2008)

Faculty Advisor, Jessup Moot Court, ASU College of Law (2002-2011).

Member, Steering Committee for Proposed School of Global Studies, ASU (2003-2004)

Member, Planning Committee for Innovation Institute, ASU (2004)

Member, Executive Planning Committee and Proposal Committee for "Borders & Security" Institute ASU (2004)

Chair, Masters Thesis Committee (name) ASU West

Chair, Senior Thesis Committee (for Michael Vincent), ASU Barrett Honors College (2008-2009)

Member, Senior Thesis Committee (for Mel Hedin), ASU Barrett Honors College (2003-2004)

Chair, New Faculty Integration Committee, ASU College of Law (2004-2006)

Chair, IT Advisory Committee, ASU College of Law (2002-2004)

Member, Communications Group Advisory Committee, ASU College of Law (2004-2011)

Member, Moot Court Advisory Board, ASU College of Law (2003-2011)

Member, Curriculum Committee, ASU College of Law (2003-2004)

Member, IT Advisory Committee, ASU College of Law (2004-2011)

Member, Graduate Programs Committee, ASU College of Law (2002-2004)

Member, Night School Curriculum Committee, ASU College of Law (2002-2003)

Member, International Studies Committee, ASU College of Law (2004-2011)

Orientation Leader, Leading small group discussion on Holmes' *The Path of the Law*, ASU College of Law (Fall 2003)

Faculty Advisor, Chicago Journal of International Law (1999-2000)

Univ. of Chicago Jessup Moot Court (Coach, 2000-2001)

Research Assistant, Dean Douglas Baird, University of Chicago Law School (1998-1999)

Research Assistant, Professor Amy Adler, Freedom Forum Media Center at Columbia Univ. (1996)

Research Assistant, Professor Paulette Caldwell, New York University (1996)

Research Assistant, Professor Guyora Binder, University of Buffalo Law School (1993-1994)

Research Assistant, Professor Catherine Tinker, University of Buffalo Law School (1993-1994)

10/8/2021

## COURSES TAUGHT

Criminal Law (Spring 2010)

Intellectual Property and Innovation (W.P. Carey School of Business, Executive MBA. Spring 2009, Spring 2010, Spring 2017)

Business Law for Managers (W.P. Carey School of Business, Evening MBA, Spring 2008, Spring 2009, Spring 2010)

Copyright Law (Fall 2009)

Law & the Regulatory State (Spring 2008, Spring 2009, Spring 2010)

Nanotechnology, Law & Policy, ASU College of Law (Spring 2007, Spring 2008, Spring 2018)

Public International Law, ASU College of Law (Fall 2007)

International Intellectual Property, ASU College of Law (Spring 2007)

Introduction to Intellectual Property, ASU College of Law (Fall 2005, Fall 2006, Fall 2007, Fall 2008, Spring 2010, Spring 2011, Spring 2012, Spring 2017)

Technology Ventures Co-requisite, ASU College of Law (Fall 2005)

Technology Ventures Clinic, Co-Founder & Faculty Director, ASU College of Law (Spring 2003-Summer 2006)

Intellectual Property Decisionmaking & Portfolio Management, ASU College of Law & W.P. Carey School of Business (Spring 2004, 2005, 2007)

e-Commerce Law, ASU College of Law (Fall 2003)

Intellectual Property Commercialization & Technology Transfer, ASU College of Law (Fall 2003, 2004, 2005)

Seminar in e-Commerce Law, ASU College of Law (Spring 2003)

International Law & Politics, ASU College of Law (Fall 2002)

Intellectual Property Strategies, Northwestern University College of Law, Kellogg Business School (Spring 2002)

e-Commerce Contracting, Northwestern University College of Law, Summer Institute (Summer 2001)

The World Trade Organization, University of Chicago, The Law School (Winter 2001)

Sovereignty, Globalization and the Future of International Intellectual Property, University of Chicago, The Law School (Spring 2000)

Research & Writing, University of Chicago, The Law School (Fall 1997-Spring 1999)

Advanced Research & Writing, St. Thomas Univ. Law School (Miami) (Spring 1997)

Research & Writing, University of Buffalo, (Teaching Assistant) (Spring 1994)

## ACADEMIC CONFERENCE PRESENTATIONS AND PANELS

Featured Presenter, "Intellectual Property Law," Universidad de Monterrey (Monterrey, Mexico) (April 2011)

10/8/2021

Featured Presenter, "Piracy, Cartels, and Mexican Intellectual Property," United States Consulate and Department of Commerce (Monterrey, Mexico) (April 2011)

Commentator, "Winter International Law Scholars' Conference" (ASU, January 2011)

Presenter and Organizer, ASU Juniors Scholars (March 2010, March 2011)

Presenter, "Hot Topics in Online Marketing Law," American Marketers Association (Phoenix, AZ) (October 2009)

Presenter, "Public Perception & Nanotechnology," Gordon Research Conference on Science & Technology Policy (Big Sky, MT August 2008)

Presenter, "Empirical Investigations into the Law of Proportionality," International Law Weekend (West), International Law Society, Salem, OR (March 2009)

Presenter, "Intellectual Property as a Human Right: A Skeptical View" International Law Weekend, International Law Society, New York (October 2008)

Presenter, "University Offices of Technology Transfer: Convergence and Consequence," Intel TechResearch Group, Chandler, Arizona (October, 2007)

Presenter, "Tensions and Challenges in U.S. Nanotechnology Regulation," Nanotechnology & the Law Workshop, K.U. Leuven, Belgium (October 2007)

Presenter, "Legal Issues in State/Federal Data Collection and Sharing," National Academies of Science, Committee on National Statistics Closed Meeting, Woods Hole, Massachusetts (September, 2007)

Presenter, "University Offices of Technology Transfer: Convergence and Consequence," Intellectual Property Rights & Technology Transfer in International Context, University of Trieste, Italy (September, 2007)

Presenter, "The Ethics of Dual-Use Regulation for Emerging Technologies: The Case of Nanotechnology," International Law & Society Conference, Berlin (July 2007)

Plenary Speaker, "Real World Student Collaborations in Law, Science, and Technology – The Technology Ventures Clinic at Arizona State University College of Law," Association of American Law School, Clinical Education Conference, New York (May 2006)

Presenter, "The Rule of Law: Public Perceptions of Rules and Rulemaking," The Clifford Symposium, DePaul Law School, Chicago (Apr. 2006)

Presenter and Panelist, "Privacy Enhancing Technologies" Surveillance and the Law Workshop, ASU (Feb. 2006)

Presenter, "Legal Regulation of Nanotechnology," International Association of Nanotechnology, San Francisco (Nov. 2005)

Featured Presenter & Panelist, "Online Issues in Trademark and Patent Law in the United States," Conference on Intellectual Property Enforcement, Mykelos Romeris University, Vilnius, Lithuania (Jan. 2005)

Presenter, "Loose Lips Sink Ships (and Studies): Maintaining Confidentiality of Data in Educational Research," Center for Research on Education in Science, Mathematics, Engineering, and Technology, ASU (Nov. 2004)

10/8/2021

Featured Presenter & Panelist, "Legal Pageantry and the Derogation of Due Process Norms in the Trial of Saddam Hussein," Law, Evil and the State, Mansfield College, Oxford (July, 2004)

Commentator. "Gramscian Hegemony and International Law" Law, War and Morality Conference, ASU College of Law (April 2004) [response to Jose Alvarez]

Featured Presenter & Panelist, "Head of State Immunity in International and United States Law," Sociedad Cubana de Ciencias Penales, Havana, Cuba (November 2003)

Moderator, "Both Sides of the United States/Iraq Conflict," ASU College of Law Student Symposium (March 2003, November 2004)

Featured Presenter, "Legal Pageantry and the Trial of Saddam Hussein," ASU College of Law, Law & Society Dinner (May 2004)

Presentation, "Legal Pageantry," ASU College of Law Faculty Presentation (December 2003)

Presenter, "Cybersecurity for IT Companies," Association of Arizona Corporate Counsel (May, 2003)

Presentation, "Head of State Immunity and Chinese Persecution of Falun Gong Members," ASU College of Law Faculty Presentation (May 2003)

Presenter, "International Law and the Invasion of Iraq," ASU College of Law Student Symposium (February 2003)

Presenter & Panelist, "Intellectual History of Restorative Justice" Univ. of Utah Law School (March 2002) [Restorative Justice Symposium]

## GUEST LECTURES AND PRESENTATIONS

Moderator, "Forensic Science for the 21st Century," Sandra Day O'Connor College of Law (April 2009)

Lecture, "Nanofoods and Government Regulation," Nanotechnology Law (February 2009) [Prof. Gary Marchant]

Guest Speaker, "Intellectual Property, Law, and Scientific Research," BIO: 416 [Senior-level and Honors Student course on "Professional Values in Science"] (Oct. 2006, Mar. 2009) [Prof. Elizabeth Davidson]

Lecture, "Information Assurance and Cybersecurity," CSE: Information Assurance (prerequisite course for certification of ASU as a Center of Academic Excellence in Information Assurance Education to be certified by the National Security Agency and Department of Homeland Security) (Oct. 2006) [Prof. Stephen Yau]

Lecture, "Patents and Technology Transfer," Science, Technology & Public Affairs (Mar. 2006, Mar. 2009, May 2010, April 2011) [course co-taught by Pres. Michael Crow and Prof. Daniel Sarewitz]

Presenter, "Patents and Patentability," Institute of Electrical and Electronics Engineers Society, DeVry University, Phoenix (Dec. 2005)

Lecture, "Information Assurance and Cybersecurity," CSE: Information Assurance (prerequisite course for certification of ASU as a Center of Academic Excellence in Information Assurance Education to be certified by the National Security Agency and Department of Homeland Security) (Oct. 2005) [Prof. Stephen Yau]

10/8/2021

Presentation, "Introduction to Transactional Law Practice," ASU College of Law 1L Speakers Series (February 2004)

Lecture, "Introduction to Intellectual Property," CLEO, ASU College of Law (June 16, 2004)

Lecture, "Cybersecurity," Introduction to Law, Science & Technology (course taught by Dr. Gary Marchant & Dr. Andrew Askland), ASU College of Law (March 4, 2003)

Lecture, "Science and the Law," Capstone Course in Biotechnology, ASU School of Life Sciences (April 3, 2003)

Presenter, "Cybersecurity and the USA PATRIOT Act," Bryan, Cave Law Firm, Phoenix Arizona (February 2003)

Presenter & Panelist, "Data Management and International Risks" E-CURE Electronic Records Conference (October 2002)

Featured Speaker, "Electronic Signatures in the Real World" E-Commerce World Forum (October, 2001)

Panelist, "International Law and E-Commerce Careers" at National Assoc. of Pre-Law Advisors (September, 2001)

Featured Lecturer, "e-Contracting and e-Payments" at Northwestern Univ. Law School Summer Institute in Corp. Law (August, 2001)

## MEDIA

Commentator, "USA Patriot Act: Ten Years Later", Arizona Week (PBS, Tucson) (September 2011)

- (http://originals.azpm.org/azweek/story/2011/9/16/1722-full-interview-with-douglas-j-sylvester-interim-dean-of-asu-college-of-law/)

## BAR MEMBERSHIPS

State of Illinois, 2001 [inactive]