1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Swarm Technology LLC, | No. CV-21-00438-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Amazon.com Incorporated, et al., | |
| Defendants. | |

In advance of the motion hearing on August 16, 2022, the Court wishes to provide the parties with its tentative ruling.  This is, to be clear, only a tentative ruling.  The point of providing it beforehand is to allow the parties to focus their argument on the issues that seem salient to the Court and to maximize their ability to address any perceived errors in the Court's logic.  This is not an invitation to submit additional briefing.

Dated this 4th day of August, 2022.

_____
Dominic W. Lanza
United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14                          <u>TENTATIVE RULING</u>
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Swarm Technology, LLC ("Plaintiff") holds certain patents related to the design of multiprocessor systems.  In this action, Plaintiff accuses Amazon Web Services, Inc. and Amazon.com, Inc. (collectively, "Defendants") of infringing those patents in violation of 35 U.S.C. § 271.

Defendants previously moved to dismiss the complaint, arguing that Plaintiff's patents are ineligible under 35 U.S.C. § 101 because they are directed to an abstract idea—computerizing the well-known project management technique known as a "scrum board"—and do not contain any inventive concepts.  (Doc. 29.)  In September 2021, the judge previously assigned to the case granted Defendants' motion.  (Doc. 64.)  However, the Court also held that "[i]f [Plaintiff] believes it may amend its pleadings to state a viable claim, then it may file a motion for leave to file a first amended complaint to explain how it could address the deficiencies identified in this Order."  (*Id.* at 9.)

Plaintiff took advantage of this opportunity and filed a motion for leave to file a First Amended Complaint ("FAC") (Doc. 66), along with a proposed FAC (Doc. 66-13).  The proposed FAC differs from the original complaint in three notable respects: *first*, it contains an array of new factual allegations intended to establish that the patents at issue are eligible under § 101 (Doc. 66-1 at 30-60); *second*, it is ostensibly supported by detailed declarations from two experts, Dr. Brent Nelson of Brigham Young University (Doc. 66-14) and Dr. Douglas Sylvester of the Sandra Day O'Connor College of Law at Arizona State University (Doc. 66-15); and *third*, whereas the original complaint accused Defendants of infringing two patents—U.S. Patent No. 9,852,004 ("the '004 Patent") and No. 10,592,275 ("the '275 Patent")—held by Plaintiff, the FAC adds allegations regarding a third patent, U.S. Patent No. 9,146,777 ("the '777 Patent").

After Plaintiff's motion to amend became fully briefed (Docs. 68, 69), the previously assigned judge recused (Doc. 76).  The Court has now had an opportunity to review the entire docket in this matter, as well as the parties' many filings concerning developments in related administrative proceedings (Docs. 81, 84, 86-92) and a recent decision in which a different court rejected the sufficiency of Plaintiff's allegations

regarding patent eligibility under § 101.  *Juniper Networks Inc. v. Swarm Tech.*, 2022 WL 3031211 (N.D. Cal. 2022).  As explained below, although the issue presents a close call, the Court concludes that the new factual allegations in the FAC are sufficiently detailed to correct the deficiencies that were present in the previous iteration of Plaintiff's complaint in this matter and in Plaintiff's pleading in the *Juniper* matter.  Accordingly, Plaintiff's motion for leave to amend is granted.

## DISCUSSION

I.    The September 2021 Dismissal Order And *Juniper*

Before addressing the parties' current arguments, it is helpful to begin by summarizing the September 2021 dismissal order and the recent *Juniper* decision, because both help frame the dispute now before the Court.

The September 2021 order begins by discussing the nature of the two patents then at issue, the '004 Patent and the '275 Patent.  (Doc. 64 at 1-2.)  It explains that they "purport[] to cover a 'processing architecture' whereby 'autonomous co-processors . . . proactively retrieve tasks from a task pool populated by a central processing unit.'"  (*Id.*)

Next, the September 2021 order identifies the relevant test for evaluating these patents' eligibility under 35 U.S.C. § 101.  (*Id.* at 3.)  It explains that, under *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014), the "two-step analysis" consists of (1) assessing whether the claims at issue are directed to a patent-ineligible concept, such as an abstract idea; and (2) if so, assessing whether the elements of the claim nevertheless "contain an inventive concept . . . that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself."  (*Id.*, cleaned up.)

As for the first step, the September 2021 order explains that the dispute turns on whether the patents may be characterized as "abstract because [they] simply computerize[] a well-known project management technique known as a 'scrum board,'" which "works by first having a project manager list tasks on sticky notes and post them on one side of a board.  As the team members collect and perform each task, they individually move the

notes from the 'incomplete' side of the board to the other side, the 'complete' side of the board."  (*Id.* at 4-5.)  Although Plaintiff argued that "the scrum board comparison is a mischaracterization of its Patents" because they "provide[] a 'multiprocessor system with the speed of parallel processing' without traditional downsides," the Court disagreed, concluding that the "Patents are directed towards the abstract idea of a scrum board. Although the Patents are aimed at allocating computer processing power in an efficient way, scrum boards also allocate human resources in an efficient way.  The Patents therefore are not aimed at a 'specific implementation of a solution' as much as they consist of 'generalized steps to be performed on a computer using conventional computer activity.' The idea of a scrum board does not become non-abstract when limited to the computer environment.  Although there is no doubt that computers could perform tasks organized by a scrum board more efficiently than humans, the idea itself remains abstract."  (*Id.* at 5-6.)

As for the second step, Plaintiff argued the inventive-concept requirement should be deemed satisfied for three reasons: (1) it had overcome previous objections to its patents under 35 U.S.C. §§ 102-03; (2) "the Patents ushered in a 'new parallel processing paradigm' that dramatically increases computer performance"; and (3) "whether its Patents represent something that genuinely improves computer performance is a question of fact, which would preclude a finding that the Patents are ineligible on a motion to dismiss."  (*Id.* at 7-8.)  The Court disagreed.  As for Plaintiff's first argument, the Court identified "caselaw show[ing] that whether a patent is novel or nonobvious [under §§ 102/103] is irrelevant to the *Alice* analysis."  (*Id.* at 7.)  As for Plaintiff's second argument, the Court held that "it is not enough that [Plaintiff] claim its Patents are novel.  The Court has already found that the Patents are abstract in that they describe a computerized scrum board, and simply applying an abstract idea to computers, standing alone, cannot be an innovative concept."  (*Id.*)  As for Plaintiff's third argument, the Court held that although "the Complaint alleged that the Patents are designed to address two problems related to parallel computer processing"—namely, "too much processing bandwidth was being occupied in assigning tasks to 'slave' processors" and "many processors were being left idle while

awaiting a task"—these allegations did not appear in the patents themselves.  (*Id.* at 7-8.)  The Court further held that "[a]lthough [Plaintiff] makes the conclusory assertion that its Patents contain claim elements that, when combined, 'are not well-understood, routine or conventional,' [Plaintiff] fails to elaborate."  (*Id.* at 8.)  The Court continued: "The Court doubts that [Plaintiff] could point to a specific inventive concept.  It is plain from the specification of the '004 Patent that it requires 'no improved computer resources . . . , just already available computers, with their already available basic functions, to use as tools in executing the claimed process.'  For example, the specification contemplates a person playing video games on their laptop and tapping into the processing power on a nearby smartphone, 'thereby enhancing the video game experience.'  This appears to be directed towards 'generic components,' such as laptops and smartphones, 'performing conventional activities,' such as playing video games.  [Plaintiff] may argue that the allocation of processing power between the laptop and smartphone is the specific inventive concept, but this allocation is based solely upon the abstract idea of a scrum board."  (*Id.* at 8-9.)  Thus, the Court concluded that "[w]ithout specific and concrete allegations of specific improvements to computer technology, all [Plaintiff] has alleged is an improvement to the speed and efficiency of computer systems stemming from the implementation of an abstract idea.  The improved efficiencies from the application of an abstract idea are not an inventive concept."  (*Id.* at 9.)

Meanwhile, *Juniper* is an action in the Northern District of California in which the plaintiff (Juniper Networks, Inc.) seeks a declaration that its patents do not infringe the '004 Patent, the '275 Patent, or the '777 Patent.  2022 WL 3031211 at *1.  In response, Plaintiff asserted counterclaims of infringement, which Juniper then moved to dismiss "on the grounds that all claims of the '777 patent, '004 patent, and '275 patent are directed to patent-ineligible subject matter under 35 U.S.C. § 101."  *Id.*  In an order filed on August 1, 2022, the district court granted Juniper's motion to dismiss.  *Id.*

Notably, the court did not address the sufficiency of Plaintiff's claims regarding the '004 Patent or the '275 Patent.  *Id.*  Instead, the court held that because this Court had

already determined those patents to be invalid under § 101 in the September 2021 order, and Plaintiff had in turn filed a pending motion to amend, it did not make sense as a matter of fairness and judicial economy to relitigate the § 101 eligibility analysis regarding the '004 Patent or the '275 Patent while the motion to amend remained pending.  *Id.*  Thus, the court dismissed the counterclaims regarding the '004 Patent and the '275 Patent "without prejudice . . . as developments in the District of Arizona or on appeal warrant."  *Id.* at *1-2.

As for Plaintiff's counterclaim regarding the '777 Patent, the court began by addressing (as this Court did in the September 2021 order) whether, under the first step of the *Alice* framework, the claims should be considered directed toward an abstract idea because they were analogous to a scrum board.  *Id.* at *5-6.  Plaintiff argued that "the '777 patent is not directed to an abstract idea because it is directed to an improvement in how computers operate and computer efficiency" and "teaches a way to reconfigure computer systems to function more efficiently," but the court disagreed, emphasizing that Plaintiff "does not point to a specific improvement to computer technology identified in the '777 patent" and that "to the extent that [Plaintiff] points to the 'monolithic integrated circuit' as an element that is non-abstract, that element is limited to the '004 and '275 patents and is not present in any claims of the '777 patent."  *Id.* at *6.

Finally, as for the second step of the *Alice* framework, Plaintiff sought to establish that "its claim represents an inventive concept" by "listing out seven elements that [Plaintiff] believes were not well-understood, routine, or conventional," but the court determined these arguments were conclusory because Plaintiff's "brief is entirely devoid of any explanation for how these seven elements were not well-understood, routine, or conventional. . . .  That is precisely where [Plaintiff] dropped the ball.  It did not plausibly allege, based on non-conclusory and factual statements, that the '777 patent embodies an inventive concept.  The conclusory allegations in the counterclaims will not do."  *Id.* at *6-7.  The court concluded by expressing "some doubt that [Plaintiff] can amend around this problem" but still granted leave to amend.  *Id.* at *7.

II.    Legal Standard

Plaintiff's amendment request is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which "advises the court that 'leave [to amend] shall be freely given when justice so requires.'"  *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).  "This policy is 'to be applied with extreme liberality.'"  *Id.* (citation omitted).  Thus, Plaintiff's amendment request should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile."  *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

Here, the sole ground on which Defendants oppose the amendment request is futility.  (Doc. 68 at 1.)  "An amended complaint is futile where it would be subject to dismissal under Rule 12(b)(6)."  *Reed v. Nevada*, 2021 WL 3722879, *2 (D. Nev. 2021) (quoting *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998)); *see also Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 538 (9th Cir. 1989) ("Leave to amend need not be given if a complaint, as amended, is subject to dismissal.").  Thus, to determine whether amendment is futile, the Court must consider whether the proposed FAC could survive a § 101 eligibility analysis under Rule 12(b)(6).

III.    The Parties' Arguments

Plaintiff argues its amendment request should be granted because its proposed FAC "contains specific and concrete allegations" sufficient to establish patentability under both steps of the *Alice* framework.  (Doc. 66.)  As for the first step, Plaintiff argues that its "invention is not directed at organizing human behavior, and is legally non-abstract" because it "invented a new computer processing architecture that reconfigures the elements of a computer's processing system and introduces new code to operate those elements.  In combination, these elements provide an improvement to the functionality of the computer itself. [Plaintiff's] new architecture revolutionizes the interaction of computer components and addresses technology issues that only arise in a computer context.  Simply put, [Plaintiff's] new architecture provides a new way for computer parts (e.g., a processing

- 8 -

system) to interact with each other by modifying existing parts (controller and co-processors) and interposing a new intermediary part (task pool) to manage communication among all the parts." (*Id.* at 1-2.) Plaintiff contends that, under *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016), improvements to "computer functionality" are necessarily non-abstract and the '004 Patent qualifies as such an improvement because it "recite[s] improvements to computer functionality, including by using co-processors that act autonomously and proactively to retrieve, process, and complete tasks without communication between the co-processors and the [Central Processing Unit ('CPU')]. In contrast, conventional coprocessors wait idly for instructions from a CPU." (*Id.* at 11-16.) Plaintiff further notes that, in *Enfish*, the Federal Circuit stated that an improvement to "chip architecture" would qualify as a non-abstract improvement and contends that the improvements described in its patents qualify as chip architecture improvements because, as discussed in the Nelson declaration, computer and multiprocessor architectures can be described as "the structure, organization, and behavior of functional components within a computer processing system." (*Id.* at 12, 16-17.) As for the second step, Plaintiff specifically identifies the following five inventive concepts that are alleged in the FAC: (1) "a controller configured to populate a task pool with a plurality of first tasks and a plurality of second tasks" ('004 Patent); (2) "a first co-processor configured to . . . retrieve a first task from the task pool . . . without any communication between the first co-processor and the controller; and a second co-processor configured to . . . retrieve a second task from the task pool . . . without any communication between the second co-processor and the controller" ('004 Patent); (3) "a task pool" interposed between "a controller" and "co-processors" ('275 Patent); (4) "configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor" on a "plug-and-play basis without any communication with the controller" ('275 Patent); and (5) "the first solidarity cell comprising a first agent configured to proactively retrieve, from the task pool, without requiring an instruction from the CPU, a matching task for the solidarity cell to process" ('777 Patent). (*Id.* at 7-11.) Plaintiff further notes that, with respect to each claimed

inventive concept, the Nelson declaration establishes that the feature was not well-understood, routine, or conventional in the field or industry.  (*Id.*)

Defendants respond that amendment would be futile.  (Doc. 68.)  According to Defendants, "although the FAC inserted an additional 30 pages and a third patent (the '777 patent) that is materially the same as the other two, it nowhere identifies an inventive concept apart from the abstract scrum board idea."  (*Id.* at 5.)  Defendants contend that "parallel processing using multiple co-processors is nothing new" and "the patents' only purported improvement is to collect the necessary tasks in a 'task pool,' and then the co-processors autonomously retrieve and complete the tasks," but all the claims remain directed to the abstract idea of a scrum board.  (*Id.* at 2, 8, 14.)  Defendants also contend that the purported benefit of greater efficiency simply flows from implementing the abstract idea itself, and therefore does not make the claims any less abstract.  (*Id.* at 13.)  Defendants also argue that the claim specifications admit that the invention does not require any improved computer technology or any particular implementation.  (*Id.* at 2-3.)  Additionally, Defendants contend that the claims themselves say nothing about a "chip architecture," making it an "unclaimed detail," and Plaintiff "cannot rely on such unclaimed details to supply the patent-eligible content."  (*Id.* at 10-11.)  As for the declarations, Defendants argue that they are improper and irrelevant—"[e]xtrinsic evidence cannot change or supplement the absence of patent-eligible subject matter in the patents themselves"—and, in any event, the declarations identify nothing inventive apart from the abstract idea.  (*Id.* at 17.)  Finally, Defendants note that Claim 1 of the '004 Patent remains representative for purposes of § 101 eligibility because Plaintiff does not argue there are any meaningful differences between the claims (and, thus, the Court needn't analyze each claim separately).  (*Id.* at 4 & n.5, 8.)

In reply, Plaintiff argues that, even assuming "interposing a task pool between a CPU and co-processors amounts to an abstract idea because the task pool is tantamount to a scrum board . . . , that abstract idea is only the beginning; Swarm's claims add 'significantly more' to the 'abstract idea.'"  (Doc. 69 at 1-2.)  In support, Plaintiff details a

few "non-limiting" examples, including a "plug-and-play" concept (which "allows an unlimited number of computational tasks to be performed by an unlimited number of task performers (co-processors) while communicating only with the task pool") and a "retrieval scheme" concept (which enables co-processors to "retrieve tasks from the task pool without requiring instructions from the CPU" and allows "one CPU to manage an unlimited number of task managers (networks) that interact with an unlimited number of task performers (co-processors)"). (*Id.* at 2.) Plaintiff contends these concepts "had never been done before" and provide technical solutions to interoperability problems in networks and computers by "unlocking unlimited scalability" and "allowing simultaneous management of multiple networks," respectively. (*Id.* at 2, 4-5.) Plaintiff also argues that, "[a]t this juncture, [it] is not required to *prove* that its inventive concepts are unconventional. Rather, [its] FAC need only properly *allege* that the claims recite more than 'well-understood, routine' activities," which it does. (*Id.* at 7.) As for the use of off-the-shelf, conventional computer technology, Plaintiff reiterates that Defendants are mistaken—Plaintiff's invention requires the computers to be "first modified by changing their operating software to implement [the] new architecture." (*Id.* at 8.) Finally, Plaintiff argues that Claim 1 of the '004 Patent is not representative of Claim 1 of the '777 Patent (because that patent contains additional elements not found in the '004 Patent), nor is it representative of any of the other claims (as Claims 2-12 of the '004 Patent, Claims 2-17 of the '275 Patent, and Claims 1-14 of the '777 Patent were first asserted in the FAC, and involve separate, non-abstract limitations). (*Id.* at 8-9.)

## IV.  Analysis

### A.  **Section 101 Eligibility**

Under 35 U.S.C. § 101, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." However, the Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are

not patentable." *Alice*, 573 U.S. at 216 (citation omitted). "[W]hether a claim recites patent-eligible subject matter is a question of law which may contain disputes over underlying facts." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

The Supreme Court has established a two-step test "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 573 U.S. at 217 (citing *Mayo Collaborative Servs. v. Prometheus Lab's, Inc.*, 566 U.S. 66, 77-78 (2012)). First, the court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* (citation omitted). However, because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," *Mayo*, 566 U.S. at 71, "courts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) (citation and internal quotation marks omitted). *See also Enfish*, 822 F.3d at 1337 ("[D]escribing the claims at [too] high [a] level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.").

"Because there is no conclusive method of determining what constitutes an 'abstract idea' that meets the first step of the *Alice* framework, courts compare the claims at issue to those claims from previous cases, already determined to be directed to an abstract idea. 'Distinguishing between claims that recite a patent-eligible invention and claims that add too little to a patent-ineligible abstract concept can be difficult, as the line separating the two is not always clear.' This difficulty is particularly pronounced in the context of patent claims related to computer technology." *Crypto Research, LLC, v. Assa Abloy, Inc.*, 236 F. Supp. 3d 671, 680-81 (E.D.N.Y. 2017) (citations omitted). On the one hand, "the use of a computer to implement a fundamental economic or conventional business practice does not, by itself, render the claims patent eligible." *Id.* at 681. On the other hand, "the Federal Circuit has held that some developments in computer-related technology, in which the focus of the claims is on solutions 'necessarily rooted in computer technology in order

to overcome a problem specifically arising in the realm of computer networks,' or on 'improvement to computer functionality itself,' are not directed to an abstract idea." *Id.* (citations omitted).

If the first step of the *Alice* analysis shows that the claims are directed to an abstract idea, the second step addresses whether the claims include an "inventive concept"—that is, whether "an element or combination of elements . . . is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217-18 (cleaned up). "The second step of the *Alice* test is satisfied when the claim limitations involve more than performance of well-understood, routine, and conventional activities previously known to the industry." *Berkheimer*, 881 F.3d at 1367 (cleaned up). "[A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

B.   **Preliminary Matters**

Before turning to the heart of the dispute—whether the factual allegations in the FAC are sufficient to survive a motion to dismiss with respect to § 101 eligibility—it is necessary to address a few preliminary matters.

First, to the extent Defendants contend it was improper for Plaintiff to add allegations regarding the '777 Patent to the FAC,[1] the Court disagrees. In the September 2021 order, the Court did not place any specific limitations on the scope of the anticipated amendment request, other than to explain that the purpose of any proposed amendment should be to "address the deficiencies identified in this Order." (Doc. 64 at 9-10.) Those deficiencies, in turn, related to the insufficiency of the factual allegations in the original complaint under both steps of the *Alice* test. Because the new allegations in the FAC related to the '777 Patent are intended to address those deficiencies, they do not fall outside the scope of the amendment authorization. Furthermore, Defendants do not contend that

---

[1]      Doc. 68 at 9 (describing Plaintiff's "attempt to add a third, related, patent" as "unsanctioned").

the new allegations regarding the '777 Patent are somehow time-barred or unfairly prejudicial.[2]   As noted, the sole ground on which Defendants oppose the amendment request is futility.  Thus, the presence of the new allegations regarding the '777 Patent does not provide a basis for denying the amendment request.

Second, although the FAC identifies an array of different claims appearing in Plaintiff's patents, "[t]he Federal Circuit has held that the district court need not address each claim of the asserted patents individually.  Instead, if the district court determines that the claims are substantially similar and linked to the same abstract idea, the court may consider a representative claim."  *Crypto Research*, 236 F. Supp. 3d at 680 (citation omitted).  Here, as in the September 2021 order, the Court agrees with Defendants that Claim 1 of the '004 Patent recites a system comprising a task pool, a controller, and co-processors completing tasks, which is substantially similar to Claim 1 of the '275 Patent and Claim 1 of the '777 Patent.  Similarly, upon the Court's review, the dependent claims— that is, Claims 2-12 of the '004 Patent, Claims 2-17 of the '275 Patent, and Claims 2-14 of the '777 Patent—flow directly from Claim 1 of their respective patents and largely recite the same content.  (*See* Doc. 66-2 at 16-17, 25-26, 42-43.)  Consequently, these claims warrant similar substantive treatment, and the Court will again consider Claim 1 of the '004 Patent to be representative.

Third, the Court agrees with Defendants that the Nelson and Sylvester declarations may not be considered at this juncture of the case.  The narrow issue to be decided here is whether Plaintiff's motion to amend should be denied on futility grounds.  The futility analysis, in turn, rises and falls with the sufficiency of the proposed FAC under Rule 12(b)(6).  And although the sufficiency analysis requires consideration of some highly technical concepts, the Federal Circuit has "repeatedly recognized that in many cases it is

---

[2]     Plaintiff notified Defendants of the issuance of the '777 Patent before the complaint was filed (Doc. 1 ¶¶ 93, 96) and Defendants themselves emphasize that the '777 Patent relates to and shares largely identical specifications with the '004 and '275 Patents (*see* Doc. 68 at 2, 4, 9).  Additionally, the remaining claims of the '004 and '275 Patents, and the claims of the '777 Patent, are alleged to have been infringed by the same products (AWS IoT Core and AWS IoT Greengrass) identified in the original complaint.  (Doc. 66-1 ¶¶ 94, 269, 281-82.)

possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion." *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016). Thus, the mere fact that Plaintiff is defending the sufficiency of its complaint against a Rule 12(b)(6) challenge does not mean that Plaintiff is entitled to introduce expert declarations in support of its defense.

Nor do the Nelson and Sylvester declarations qualify as the sorts of materials that a district court would ordinarily be allowed to consider when ruling on a Rule 12(b)(6) challenge. It is hornbook law that "a district court may not consider any material beyond the pleadings in ruling on a 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (cleaned up). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003). It is difficult to see how that Nelson and Sylvester declarations could fall within any of these exceptions. They are not attached to the proposed FAC (at the risk of putting form over substance, they were filed as attachments to the motion to amend, not as attachments to the proposed FAC),[3] they are not incorporated by reference in the proposed FAC (the words "Nelson" and "Sylvester" do not appear anywhere in the proposed FAC), and they are not subject to judicial notice. *Cf. Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 755 (Fed. Cir. 2019) (affirming district court's refusal to consider patentee's expert declaration when ruling on a § 101-based motion to dismiss in part because "[t]he declaration does not 'merge into the pleadings,' as the complaint does not reference it or otherwise depend on it. Nor is the declaration an official public record, another type of document a court may consider with the pleadings."). Indeed, it appears that Plaintiff's purpose in submitting the declarations was to prove the

---

[3]     Doc. 66 at introductory page ("Plaintiff . . . respectfully moves the Court for leave to file the attached redlined [FAC] (Exhibit 1). As a courtesy, a clean copy of the FAC is also attached as Exhibit 2. This Motion for Leave to file the FAC . . . is made pursuant to Fed. R. Civ. P. 15(a)(2) and supported by the Declarations of Dr. Brent Nelson and Dr. Douglas Sylvester attached as Exhibits 3 . . . and 4 . . . .").

veracity of the factual allegations in the FAC.  (Doc. 69 at 10 ["As an expert with decades of computing experience, Dr. Nelson confirms the factual allegations in ¶¶ 178-181 of the FAC."].)  But there is no need to prove anything at the Rule 12(b)(6) stage—"[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

### C.    **Merits**

For the reasons set forth below, the Court concludes that the new factual allegations in the FAC are sufficient to cure the deficiencies identified in the September 2021 order (and in the *Juniper* decision) and avoid dismissal on futility grounds.

As for the first step of the *Alice* analysis, the September 2021 order concluded that the "Patents are directed towards the abstract idea of a scrum board" because the factual allegations in the original complaint merely showed that "the Patents are aimed at allocating computer processing power in an efficient way," yet "scrum boards also allocate human resources in an efficient way."  (Doc. 64 at 5-6.)  Thus, the September 2021 order stated that "[t]he Patents therefore are not aimed at a 'specific implementation of a solution' as much as they consist of 'generalized steps to be performed on a computer using conventional computer activity.'"  (*Id.* at 5-6.)

This analysis correctly applied the law to the then-applicable facts,[4] but the facts have now changed.  The original complaint did not mention the phrase "functionality" and included no allegations about whether the patents resulted in computer-specific functionality improvements.  (Doc. 1.)  The proposed FAC, in contrast, specifically alleges that, "[t]aken together, the controller, task pool, and co-processors confer a substantial advantage over prior art processing systems by allowing different types of co-processors

---

[4]    *See, e.g.*, *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366-67 (Fed. Cir. 2015) ("An abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment . . . . A simple instruction to apply an abstract idea on a computer is not enough. . . .  Nor . . . does claiming the improved speed or efficiency inherent with applying the abstract idea on a computer provide a sufficient inventive concept.") (citations omitted).

to interact with the task pool without significantly compromising their individual performance. Claim 1 [of the '004 Patent] thus focuses on improvements to computer functionality, as opposed to merely being directed to an abstract idea." (Doc. 66-1 at 31 ¶ 127.) Elsewhere, the proposed FAC elaborates as to why these efficiency improvements are computer-specific: "[C]onventional processors include a CPU and one or more co-processors, where the CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Consequently, a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors. To address these shortcomings, [the '004 Patent] invented a revolutionary new parallel processing paradigm, including co-processors configured to proactively retrieve new tasks from the task pool without having to communicate directly with (or wait for) the CPU." (*Id.* at 32 ¶¶ 131-32.) Finally, and perhaps in an effort to address the criticism in the September 2021 order that any claimed improvements in computer functionality did not appear in the patents themselves,[5] the FAC specifically identifies where claims of computer-specific improvements related to bandwidth consumption appear in the '004 Patent. (*Id.* at 31 ¶ 131, citing '004 Patent at 1:56-59 and at 1:63-2:1.)

These new factual allegations are significant because a claimed improvement is considered non-abstract for purposes of step one of the *Alice* framework if it "is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). Put another way, claims "directed to an improvement in the functioning of a computer" and claims "directed to a specific implementation of a solution to a problem in the software arts," which stand in contrast with claims that "simply add[]

---

[5]    Doc. 64 at 7-8 ("Here, the Complaint alleges that the Patents are designed to address two problems related to parallel computer processing [*i.e.*, occupied processing bandwidth and idling processors] . . . . But, unlike in *Aatrix*, there are no allegations of a specific inventive concept within the Patents.").

conventional computer components to well-known business practices," are "not directed to an abstract idea." *Enfish*, 822 F.3d at 1338-39. *See also Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348-49 (Fed. Cir. 2018) ("[C]laim 1 of the '941 patent is not directed to an abstract idea. Improving security . . . can be a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem. . . . In short, claim 1 of the '941 patent is directed to a solution to a computer-functionality problem . . . [and] therefore passes muster under *Alice* step one, as it is not directed to patent-ineligible subject matter."). Here, the new factual allegations in the FAC plausibly allege that the claimed processing system results in improvements to functionality that are computer-specific. Taken as true, these allegations suggest "the claims are patent-eligible." *Enfish*, 822 F.3d at 1339.

These new factual allegations also differentiate the proposed FAC from the pleading that was deemed insufficient in *Juniper*. There, although Plaintiff attempted to argue "that the '777 patent teaches a way to reconfigure computer systems to function more efficiently," the court concluded this argument was not supported by the record because "[Plaintiff] does not point to a specific improvement to computer technology identified in the '777 patent. Instead, [Plaintiff] quotes language from the patent that the system 'may be implemented retroactively on any computer or computer network having an operating system that may be modified or otherwise configured to implement the functionality described.' This falls short of teaching a specific improvement to computer technology, instead simply reconfiguring traditional computer networks to operate as claimed in the '777 patent." 2022 WL 3031211 at *6. But as discussed above, the FAC now remedies this oversight by adding detailed allegations regarding computer-specific functionality improvements and establishing that those improvements are claimed in the '004 Patent itself (as opposed to being an after-the-fact litigation invention).

Alternatively, even if the new factual allegations in the FAC were deemed insufficient under the first step of the *Alice* framework, the FAC sufficiently expounds upon inventive concepts to survive dismissal under step two. For example, the FAC now

alleges that the claims are specifically directed to autonomous co-processing that allows for an unlimited number of controllers and co-processors to work together quickly, simultaneously, seamlessly (*e.g.*, when some cells cannot complete a task and are then removed), and without instruction by the CPU or by the task pool. (*See, e.g.*, Doc. 66-1 at 32-33 ¶¶ 131-33, 35-36 ¶ 146.)   The FAC also adds detailed descriptions of how a co-processor may be configured to (1) retrieve a task from the task pool when it is otherwise idle (*id.* at 30 ¶ 128), (2) proactively retrieve new tasks and mark them as complete, saving a significant amount of CPU bandwidth from being consumed by task distribution and by responding to interrupts from co-processors (*id.* at 32-33 ¶¶ 131-133, 35 ¶¶ 140-41), and (3) communicate with other co-processors on a plug-and-play basis despite having different instruction sets (*id.* at 36 ¶ 144-45).   And the FAC also plausibly alleges that these autonomous functions involve more than performance of routine and conventional activities previously known to the industry.  Among other things, the FAC now alleges that "[p]rior to [the] invention, conventional multiprocessors included a [CPU] and one or more co-processors . . . .  That is, the processing 'architecture' consisted of a primary controller which distributed tasks directly to a plurality of co-processors.  This conventional approach is disadvantageous in that a significant amount of the CPU's processing cycles (bandwidth) is consumed by task distribution, while the co-processors often remain idle while waiting for a new task from the CPU.  [The Patents] modified the arrangement of components (the architecture) of multiprocessing systems . . . by interposing an intermediate device—the task pool—between the CPU and the co-processors.  In addition, [the Patents] modified the way each of those components operate, both individually and in combination with each other.  As a result, [the Patents create] a new multiprocessor system architecture which had never existed before."  (Doc. 66-1 at 3 ¶¶ 3-4.)

Although Defendants may be able to establish at a future stage of the case that these allegations regarding unconventionality are untrue, all that matters for present purposes is that the factual allegations, taken as true, plausibly support Plaintiff's claim of unconventionality.  And in the Court's estimation, they do.  *Berkheimer*, 881 F.3d at 1367.

For related reasons, although Plaintiff may have "dropped the ball" with respect to the second step in *Juniper* by providing only "conclusory" allegations as to why the claimed improvements were unconventional, 2022 WL 3031211 at *7, the new factual allegations in the FAC remedy this deficiency for the reasons stated above. Identifying a task from the task pool and completing the task may be analogous to a project manager's use of a scrum board, but Plaintiff has now plausibly alleged that the analogy falls short in light of the added considerations of autonomy and seamless functioning, which suggest an unconventional concept apart from the abstract idea. Humans couldn't very well utilize a scrum board with absolutely no communication or direction from either the manager or the scrum board itself about what the tasks are and what the employees are to do with them before, during, or after completion. Nor could humans work efficiently with employees who are quickly brought in and trained under different instruction sets, as the co-processors are alleged do here. *See, e.g.*, *Alice*, 573 U.S. at 217 ("[A]n invention is not rendered ineligible for patent simply because it involves an abstract concept. Applications of such concepts to a new and useful end, we have said, remain eligible for patent protection. Accordingly, in applying the § 101 exception, we must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more . . . .") (cleaned up).

Although Plaintiff's claims were previously described at a high level of generality directed to the abstract idea of organizing and efficiency, the proposed FAC now provides a more detailed explanation of how Plaintiff's system solves problems that specifically arise in the arena of computer technology and how the elements are not conventional, well-understood, or routine. Such detailed factual allegations, taken as true, prevent resolving the eligibility question as a matter of law at the pleading stage. *See, e.g.*, *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125-27 (Fed. Cir. 2018) (emphasizing that "plausible factual allegations may preclude dismissing a case under § 101" and finding that the district court erred when it denied leave to amend "in the face of factual allegations, spelled out in the proposed second amended complaint, that, if accepted as true, establish

that the claimed combination contains inventive components and improves the workings of the computer"). *Compare Simio, LLC v. FlexSim Software Prod., Inc.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020) (affirming district court's denial of leave to amend where the plaintiff provided nothing more than conclusory statements that the features of its invention "improve[d] the functioning and operations of the computer," with nothing else).

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for leave to amend (Doc. 66) is **granted**.

**IT IS FURTHER ORDERED** that Plaintiff must file its proposed FAC (Doc. 66-13) within seven days of the issuance of this order.