# *Swarm Technology, LLC*

# *v.*

# *Amazon.com, Inc. and Amazon Web Services, Inc.*

No. 2:21cv438-DWL                    U.S. District Court for the District of Arizona

## Amazon Defendants' Opposition to
## Motion for Leave to File First Amended Complaint

### August 16, 2022

1

# Federal Circuit Decisions Holding Claims Ineligible On Rule 12 Motions Under *Alice*

| | | |
|---|---|---|
| *Repifi Vendor Logistics v. IntelliCentrics* (2022) | *Braemar Mfg., LLC v. ScottCare Corp.* (2020) | *Smart Sys. Innovations, LLC v. Chicago Transit Authority* (2017) |
| *Universal Secure v. Apple* (2021) | *Dropbox, Inc. v. Synchronoss Techs., Inc.* (2020) | *Secured Mail Sols. LLC v. Universal Wilde, Inc.* (2017) |
| *MyMail v. ooVoo* (2021) | *Ubisoft Entm't, S.A. v. Yousician Oy* (2020) | *Cleveland Clinic Found. v. True Health Diag. LLC* (2017) |
| *PersonalWeb Techs v. Google* (2021) | *British Telecomm'ns PLC v. IAC/InterActiveCorp* (2020) | *RecogniCorp, LLC v. Nintendo Co., Ltd.* (2017) |
| *Sensormatic Electronics v. Wyze Labs* (2021) | *Elec. Comm'n Techs., LLC v. ShoppersChoice.com* (2020) | *West View Research, LLC v. Audi AG* (2017) |
| *Aftechmobile v. Salesforce.com* (2021) | *Cisco Systems, Inc. v. Uniloc 2017 LLC* (2020) | *Coffelt v. NVIDIA Corp.* (2017) |
| *Yu v. Apple Inc.* (2021) | *WhitServe LLC v. Donuts Inc.* (2020) | *Intellectual Ventures I LLC v. Erie Indemnity Co.* (2017) |
| *Free Stream Media v. Alphonso* (2021) | *Bridge & Post, Inc. v. Verizon Comm'ns, Inc.* (2019) | *Evolutionary Intelligence v. Sprint Nextel Corp.* (2017) |
| *WhitServe LLC v. Dropbox, Inc.* (2021) | *ChargePoint, Inc. v. SemaConnect, Inc.* (2019) | *FairWarning IP, LLC v. Iatric Systems, Inc.* (2016) |
| *Enco Sys., Inc. v. DaVincia, LLC* (2021) | *Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.* (2019) | *Affinity Labs of Texas, LLC v. DIRECTV, LLC* (2016) |
| *VeriPath, Inc. v. Didomi* (2021) | *Voit Techs., LLC v. Del-Ton, Inc.* (2019) | *Affinity Labs of Texas, LLC v. Amazon.com Inc.* (2016) |
| *Boom! Payments, Inc. v. Stripe, Inc.* (2021) | *Athena Diagnostics, Inc. v. Mayo Coll. Servs., LLC* (2019) | *TDE Petroleum Data Sols. v. AKM Enterprise, Inc.* (2016) |
| *Mortg. Appl. Techs., LLC v. MeridianLink, Inc.* (2021) | *Glasswall Sols. Ltd. v. Clearswift Ltd.* (2018) | *Shortridge v. Found. Construction Payroll Serv.* (2016) |
| *NetSoc, LLC v. Match Grp., LLC* (2020) | *SAP Am., Inc. v. InvestPic, LLC* (2018) | *In re TLI Commc'ns LLC Patent Litig.* (2016) |
| *Simio, LLC v. FlexSim Software Prods., Inc.* (2020) | *Interval Licensing LLC v. AOL, Inc.* (2018) | *Genetic Techs. Ltd. v. Merial L.L.C.* (2016) |
| *Adaptive Streaming Inc. v. Netflix, Inc.* (2020) | *Burnett v. Panasonic Corp.* (2018) | *Vehicle Intell. & Safety LLC v. Mercedes-Benz USA* (2015) |
| *Fast 101 Pty Ltd. v. CitiGroup Inc.* (2020) | *Voter Verified, Inc. v. Election Sys. & Software LLC* (2018) | *Internet Patents Corp. v. Active Network, Inc.* (2015) |
| *Tenstreet, LLC v. DriverReach, LLC* (2020) | *Maxon, LLC v. Funai Corp., Inc.* (2018) | *OIP Techs., Inc. v. Amazon.com, Inc.* (2015) |
| *W. Express Bancshares, LLC v. Green Dot Corp.* (2020) | *Automated Tracking Sols., LLC v. Coca-Cola Co.* (2018) | *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n* (2014) |
| *Data Scape Ltd. v. W. Digital Corp.* (2020) | *Intellectual Ventures I LLC v. Erie Indemnity Co.* (2017) | *Ultramercial, Inc. v. Hulu, LLC* (2014) |
| *CardioNet, LLC v. InfoBionic, Inc.* (2020) | *Two-Way Media Ltd. v. Comcast Cable Comm'ns, LLC* (2017) | *buySAFE, Inc. v. Google, Inc.* (2014) |

# Swarm Filed Claims In *Juniper* After Filing FAC Here

**Tentative**

C. **Merits**

For the reasons set forth below, the Court concludes that the <mark>new factual allegations</mark> in the FAC are <mark>sufficient to cure the deficiencies identified in</mark> the September 2021 order (and in <mark>the *Juniper* decision)</mark> and avoid dismissal on futility grounds.

\*　　　\*　　　\*

<mark>These new factual allegations also differentiate</mark> the proposed FAC from the pleading that was deemed insufficient in <mark>*Juniper*.</mark> There, although Plaintiff attempted to argue "that

\*　　　\*　　　\*

For related reasons, <mark>although Plaintiff may have "dropped the ball" with respect to the second step in *Juniper*</mark> by providing only "conclusory" allegations as to why the claimed improvements were unconventional, 2022 WL 3031211 at \*7, the <mark>new factual allegations in the FAC remedy this deficiency</mark> for the reasons stated above. Identifying a

**Tentative at 16, 18, 20**

**Sept. 20, 2021**
This Court granted Amazon's motion to dismiss

**Oct. 20, 2021**
Swarm filed FAC

**Jan. 4, 2022**
Swarm filed claims against Juniper

**All relevant FAC paragraphs are in Swarm's claims against *Juniper***



| FAC (Doc. 66-2) | | Juniper (Doc. 64) |
|---|---|---|
| ¶¶ 3–4 | = | ¶¶ 74–75 |
| ¶¶ 127–28 | = | ¶¶ 144–45 |
| ¶¶ 131–33 | = | ¶¶ 148–50 |
| ¶¶ 140–41 | = | ¶¶ 157–58 |
| ¶¶ 144–46 | = | ¶¶ 161–63 |

# Step 1 — FAC Is Indistinguishable From Swarm's Allegations In *Juniper*

**FAC**
(Doc. 66-2)

**Step 1**

¶ 127
¶ 131
¶ 132

**Tentative**

This analysis correctly applied the law to the then-applicable facts,[4] but the facts have now changed. The original complaint did not mention the phrase "functionality" and included no allegations about whether the patents resulted in computer-specific functionality improvements. (Doc. 1.) The proposed FAC, in contrast, specifically alleges that, "[t]aken together, the controller, task pool, and co-processors confer a substantial advantage over prior art processing systems by allowing different types of co-processors to interact with the task pool without significantly compromising their individual performance. Claim 1 [of the '004 Patent] thus focuses on improvements to computer functionality, as opposed to merely being directed to an abstract idea." (Doc. 66-1 at 31 ¶ 127.) Elsewhere, the proposed FAC elaborates as to why these efficiency improvements are computer-specific: "[C]onventional processors include a CPU and one or more co-processors, where the CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Consequently, a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors. To address these shortcomings, [the '004 Patent] invented a revolutionary new parallel processing paradigm, including co-processors configured to proactively retrieve new tasks from the task pool without having to communicate directly with (or wait for) the CPU." (*Id.* at 32 ¶¶ 131-32.) Finally, and perhaps in an effort to address the criticism in the September 2021 order that any claimed improvements in computer functionality did not appear in the patents themselves,[5] the FAC specifically identifies where claims of computer-specific improvements related to bandwidth consumption appear in the '004 Patent. (*Id.* at 31 ¶ 131, citing '004 Patent at 1:56-59 and at 1:63-2:1.)

**Tentative at 16-17**

# Step 1 – FAC Is Indistinguishable From Swarm's Allegations In *Juniper*

**FAC**
(Doc. 66-2)

**Step 1**

¶ 127
¶ 131
¶ 132

**Juniper**
(Doc. 64)

**Step 1**

¶ 144
¶ 148
¶ 149

127.   The claimed processing system involves new and useful machines and processes, and new and useful improvements to machines and processes. Taken together, the controller, task pool, and co-processors confer a substantial advantage over prior art processing systems by allowing different types of co-processors to interact with the task pool without significantly compromising their individual performance. (*See Visual Memory LLC v. NVIDIA Corporation*, 867 F.3d 1253, 1256-1257 (Fed. Cir. 2017)). Claim 1 thus focuses on improvements to computer functionality, as opposed to merely being directed to an abstract idea. (*See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016)). Moreover, these improvements are agnostic to the *type* of activities (whether human or non-human) to be processed.

131.   The task pool improves the operation of a computer by acting as an intermediary device between the CPU and the co-processors. More particularly, conventional processors include a CPU and one or more co-processors, where "[t]he CPU partitions the computational requirements into tasks and distributes the tasks to co-processors." ('004; 1:56-59). Consequently, "a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors." ('004 1:63-2:1).

132.   To address these shortcomings, Swarm invented a revolutionary new parallel processing paradigm, including co-processors configured to proactively retrieve new tasks from the task pool without having to communicate directly with (or wait for) the CPU.

144.   The claimed processing system involves new and useful machines and processes, and new and useful improvements to machines and processes. Taken together, the controller, task pool, and co-processors confer a substantial advantage over prior art processing systems by allowing different types of co-processors to interact with the task pool without significantly compromising their individual performance. (*See Visual Memory LLC v. NVIDIA Corporation*, 867 F.3d 1253, 1256-1257 (Fed. Cir. 2017)). Claim 1 thus focuses on improvements to computer functionality, as opposed to merely being directed to an abstract idea. (*See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016)). Moreover, these improvements are agnostic to the *type* of activities (whether human or non-human) to be processed.

148.   The task pool improves the operation of a computer by acting as an intermediary device between the CPU and the co-processors. More particularly, conventional processors include a CPU and one or more co-processors, where "[t]he CPU partitions the computational requirements into tasks and distributes the tasks to co-processors." ('004; 1:56-59). Consequently, "a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors." ('004 1:63-2:1).

149.   To address these shortcomings, Swarm invented a revolutionary new parallel processing paradigm, including co-processors configured to proactively retrieve new tasks from the task pool without having to communicate directly with (or wait for) the CPU.

# *Juniper* Correctly Determined That Swarm Failed At Step 1

**Juniper**
(Doc. 64)

## Juniper Ruling

"The language of Claim 1 and the specification make it clear that the claim is drawn to the abstract idea of retrieving and completing tasks from a task pool. Processes are directed to an abstract idea where they are 'the sort of process that "can be performed in the human mind, or by a human using a pen and paper."' *Ericsson Inc. v. TLC Commc'n Tech. Holdings Ltd.,* 955 F.3d 1317, 1327 (Fed. Cir. 2020) (quoting *CyberSource Corp. v. Retail Decisions, Inc.,* 654 F.3d 1366, 1372 (Fed. Cir. 2011)). Juniper analogizes the process in Claim 1 to a scrum board, which is a tool frequently used in software development to keep track of tasks that need to be done, tasks in progress, and completed tasks. Dkt. No. 75 at 10. Scrum boards are an apt analogy, but the principles of allocating tasks among workers and workers proactively seeking more tasks upon completion without direction from a project manager has been practiced throughout history and across industries. For example, a group of attorneys conducting document review might have a client collect all the relevant documents into a pool where each member of the team can retrieve documents, review those documents, and then proactively return to retrieve additional documents for review. Or a community might come together to raise supplies for a school by generating a list of needed supplies and having community members choose items from the list to purchase and donate. Countless other examples come to mind. Such a 'fundamental [and] long prevalent' practice is a quintessential abstract idea. *Intellectual Ventures I LLC v. Symantec Corp.,* 838 F.3d 1307, 1314 (Fed. Cir. 2016) (quoting Alice, 573 U.S. at 219)."

**2022 WL 3031211 at \*5**

**Step 1**

¶ 144

¶ 148

¶ 149

6

# *Juniper* Correctly Determined That Swarm Failed At Step 1

*Juniper*
(Doc. 64)

**Step 1**

¶ 144
¶ 148
¶ 149

## *Juniper* Ruling

"Swarm says that the '777 patent is not directed to an abstract idea because it is directed to an improvement in how computers operate and computer efficiency. Dkt. No. 76 at 7; *see Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016). But '[t]he abstract idea here is not meaningfully different from the ideas found to be abstract in other cases before the Supreme Court and [the Federal Circuit] involving methods of organizing human activity.' *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015)."

**2022 WL 3031211 at \*6**

## Dkt. No. 76 at 7 (*Swarm's Opp. in Juniper*)

As explained in the '004 Patent, the claims are directed to *improvements* to how computers operate and are thus non-abstract:[9]

\*       \*       \*

_____

[9] The analysis of the '004 Patent also applies to the claims of the '275 and '777 Patents.

**Swarm's Opp. to Juniper's MTD (Doc. 76) at 7 & n.9**

7

# Step 2 – FAC Is Indistinguishable From Swarm's Allegations In *Juniper*

**FAC**
**(Doc. 66-2)**

Step 1

¶ 127

¶ 131

¶ 132

**Step 2**

¶ 3

¶ 4

¶ 128

¶ 131

¶ 132

¶ 133

¶ 140

¶ 141

¶ 144

¶ 145

¶ 146

## Tentative

Alternatively, even if the new factual allegations in the FAC were deemed insufficient under the first step of the *Alice* framework, the FAC sufficiently expounds upon inventive concepts to survive dismissal under step two. For example, the FAC now alleges that the claims are specifically directed to autonomous co-processing that allows for an unlimited number of controllers and co-processors to work together quickly, simultaneously, seamlessly (*e.g.*, when some cells cannot complete a task and are then removed), and without instruction by the CPU or by the task pool. (*See, e.g.*, Doc. 66-1 at 32-33 ¶¶ 131-33, 35-36 ¶ 146.) The FAC also adds detailed descriptions of how a co-processor may be configured to (1) retrieve a task from the task pool when it is otherwise idle (*id.* at 30 ¶ 128), (2) proactively retrieve new tasks and mark them as complete, saving a significant amount of CPU bandwidth from being consumed by task distribution and by responding to interrupts from co-processors (*id.* at 32-33 ¶¶ 131-133, 35 ¶¶ 140-41), and (3) communicate with other co-processors on a plug-and-play basis despite having different instruction sets (*id.* at 36 ¶ 144-45). And the FAC also plausibly alleges that these autonomous functions involve more than performance of routine and conventional activities previously known to the industry. Among other things, the FAC now alleges that "[p]rior to [the] invention, conventional multiprocessors included a [CPU] and one or more co-processors . . . . That is, the processing 'architecture' consisted of a primary controller which distributed tasks directly to a plurality of co-processors. This conventional approach is disadvantageous in that a significant amount of the CPU's processing cycles (bandwidth) is consumed by task distribution, while the co-processors often remain idle while waiting for a new task from the CPU. [The Patents] modified the arrangement of components (the architecture) of multiprocessing systems . . . by interposing an intermediate device—the task pool—between the CPU and the co-processors. In addition, [the Patents] modified the way each of those components operate, both individually and in combination with each other. As a result, [the Patents create] a new multiprocessor system architecture which had never existed before." (Doc. 66-1 at 3 ¶¶ 3-4.)

**Tentative at 18-19**

8

# Step 2 – FAC Is Indistinguishable From Swarm's Allegations In *Juniper*

**FAC (Doc. 66-2)**

Step 1
¶ 127
¶ 131
¶ 132

**Step 2**
¶ 3
¶ 4
¶ 128
¶ 131
¶ 132
¶ 133
¶ 140
¶ 141
¶ 144
¶ 145
¶ 146

3. Prior to Mr. Íñiguez' invention, conventional multiprocessors included a central processing unit ("CPU") and one or more co-processors (see below). That is, the processing "architecture" consisted of a primary controller which distributed tasks directly to a plurality of co-processors. This conventional approach is disadvantageous in that a significant amount of the CPU's processing cycles (bandwidth) is consumed by task distribution, while the co-processors often remain idle while waiting for a new task from the CPU.

Conventional Architecture

4. Mr. Íñiguez modified the arrangement of components (the architecture) of multiprocessing systems (see below) by interposing an intermediate device – the task pool – between the CPU and the co-processors. In addition, Mr. Íñiguez modified the way each of those components operate, both individually and in combination with each other. As a result, Mr. Íñiguez proposed a new multiprocessor system architecture which had never existed before.

Swarm Architecture

***Juniper* (Doc. 64)**

Step 1
¶ 144
¶ 148
¶ 149

**Step 2**
¶ 74
¶ 75
¶ 145
¶ 148
¶ 149
¶ 150
¶ 157
¶ 158
¶ 161
¶ 162
¶ 163

74. Prior to Mr. Íñiguez' invention, conventional multiprocessors included a central processing unit ("CPU") and one or more co-processors (see illustration below). That is, the processing "architecture" consisted of a primary controller which distributed tasks directly to a plurality of co-processors. This conventional approach is disadvantageous in that a significant amount of the CPU's processing cycles (bandwidth) is consumed by task distribution, while the co-processors often remain idle while waiting for a new task from the CPU.

Conventional Architecture

75. Mr. Íñiguez modified the arrangement of components (the architecture) of multiprocessing systems (see illustration below) by interposing an intermediate device – the task pool – between the CPU and the co-processors. In addition, Mr. Íñiguez modified the way each of those components operate, both individually and in combination with each other. As a result, Mr. Íñiguez invented a new multiprocessor system architecture which had never existed before.

Swarm Architecture

# Step 2 – FAC Is Indistinguishable From Swarm's Allegations In *Juniper*

**FAC**
(Doc. 66-2)

Step 1

¶ 127
¶ 131
¶ 132

**Step 2**

¶ 3
¶ 4
**¶ 128**
¶ 131
¶ 132
¶ 133
¶ 140
¶ 141
¶ 144
¶ 145
¶ 146

**128.** Even assuming, *arguendo*, that claim 1 is directed to an abstract idea involving organizing human activities such as a scrum board (it is not), claim 1 nonetheless includes inventive concepts that amount to significantly more than an abstract idea. For example, each co-processor may be configured to retrieve a task by sending its agent to the task pool when the co-processor is idle or otherwise able to contribute processing cycles without impeding its normal operation. In this context, the term agent refers to a software module, analogous to a network packet, associated with a co-processor that interacts with the task pool to obtain tasks which are appropriate for that co-processor. ('004; 3:1-14). Humans are not capable of performing tasks such as transmitting a network packet from a co-processor to a data structure (*e.g.*, task pool); they are specific to computer operation.

**145.** Even assuming, *arguendo*, that Claim 1 may be directed to an abstract idea involving organizing human activities such as a scrum board (it is not), Claim 1 nonetheless includes inventive concepts that amount to significantly more than an abstract idea. For example, each co-processor may be configured to retrieve a task by sending its agent to the task pool when the co-processor is idle or otherwise able to contribute processing cycles without impeding its normal operation. In this context, the term agent refers to a software module, analogous to a network packet, associated with a co-processor that interacts with the task pool to obtain tasks which are appropriate for that co-processor. ('004; 3:1-14). Humans are not capable of performing tasks such as transmitting a network packet from a co-processor to a data structure (*e.g.*, task pool); they are specific to computer operation.

**Juniper**
(Doc. 64)

Step 1

¶ 144
¶ 148
¶ 149

**Step 2**

¶ 74
¶ 75
**¶ 145**
¶ 148
¶ 149
¶ 150
¶ 157
¶ 158
¶ 161
¶ 162
¶ 163

10

# Step 2 – FAC Is Indistinguishable From Swarm's Allegations In *Juniper*

**FAC**
(Doc. 66-2)

~~Step 1~~

~~¶ 127~~
~~¶ 131~~
~~¶ 132~~

**Step 2**

¶ 3
¶ 4
¶ 128

**¶ 131**
**¶ 132**
**¶ 133**

¶ 140
¶ 141
¶ 144
¶ 145
¶ 146

**131.** The task pool improves the operation of a computer by acting as an intermediary device between the CPU and the co-processors. More particularly, conventional processors include a CPU and one or more co-processors, where "[t]he CPU partitions the computational requirements into tasks and distributes the tasks to co-processors." ('004; 1:56-59). Consequently, "a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors." ('004 1:63-2:1).

**132.** To address these shortcomings, Swarm invented a revolutionary new parallel processing paradigm, including co-processors configured to proactively retrieve new tasks from the task pool without having to communicate directly with (or wait for) the CPU.

**133.** Even assuming, *arguendo*, that claim 1 is directed to an abstract idea (it is not), claim 1 nonetheless includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry. (*See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018)). For example, the CPU may be programmed "to recognize and communicate with the task pool 13 and divide the computing requirements into threads ...." ('004; 5:40-43). As a result, "a co-processor may interact with the task pool without being instructed to do so by the CPU or by the task pool" ('004; 2:38-40).

**Juniper**
(Doc. 64)

~~Step 1~~

~~¶ 144~~
~~¶ 148~~
~~¶ 149~~

**Step 2**

¶ 74
¶ 75
¶ 145

**¶ 148**
**¶ 149**
**¶ 150**

¶ 157
¶ 158
¶ 161
¶ 162
¶ 163

**148.** The task pool improves the operation of a computer by acting as an intermediary device between the CPU and the co-processors. More particularly, conventional processors include a CPU and one or more co-processors, where "[t]he CPU partitions the computational requirements into tasks and distributes the tasks to co-processors." ('004; 1:56-59). Consequently, "a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors." ('004 1:63-2:1).

**149.** To address these shortcomings, Swarm invented a revolutionary new parallel processing paradigm, including co-processors configured to proactively retrieve new tasks from the task pool without having to communicate directly with (or wait for) the CPU.

**150.** Even assuming, *arguendo*, that Claim 1 is directed to an abstract idea (it is not), Claim 1 nonetheless includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry. (*See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018)). For example, the CPU may be programmed "to recognize and communicate with the task pool 13 and divide the computing requirements into threads ...." ('004; 5:40-43). As a result, "a co-processor may interact with the task pool without being instructed to do so by the CPU or by the task pool" ('004; 2:38-40).

# Step 2 – FAC Is Indistinguishable From Swarm's Allegations In *Juniper*

**FAC**
**(Doc. 66-2)**

Step 1

¶ 127
¶ 131
¶ 132

**Step 2**

¶ 3
¶ 4
¶ 128
¶ 131
¶ 132
¶ 133
**¶ 140**
**¶ 141**
¶ 144
¶ 145
¶ 146

**Juniper**
**(Doc. 64)**

Step 1

¶ 144
¶ 148
¶ 149

**Step 2**

¶ 74
¶ 75
¶ 145
¶ 148
¶ 149
¶ 150
**¶ 157**
**¶ 158**
¶ 161
¶ 162
¶ 163

**140.** The first and second co-processors, both individually and in combination with each other and/or one or more additional co-processors, improve the operation of a computer by retrieving tasks from a task pool (rather than from the CPU). The co-processors further improve the operation of computers by updating the task pool to reflect task completion, as opposed to conventional processing architectures in which the co-processors directly update the CPU.

**141.** Even assuming, *arguendo*, that claim 1 is directed to an abstract idea (it is not), claim 1 nonetheless includes numerous inventive concepts. For example, the first and second co-processors are specifically programmed to retrieve respective tasks from the task pool, and subsequently update the task pool after completing their respective tasks, without directly communicating with the controller.

**157.** The first and second co-processors, both individually and in combination with each other and/or one or more additional co-processors, improve the operation of a computer by retrieving tasks from a task pool (rather than from the CPU). The co-processors further improve the operation of computers by updating the task pool to reflect task completion, as opposed to conventional processing architectures in which the co-processors directly update the CPU.

**158.** Even assuming, *arguendo*, that Claim 1 is directed to an abstract idea (it is not), Claim 1 nonetheless includes numerous inventive concepts. For example, the first and second co-processors are specifically programmed to retrieve respective tasks from the task pool, and subsequently update the task pool after completing their respective tasks, without directly communicating with the controller.

12

# Step 2 – FAC Is Indistinguishable From Swarm's Allegations In *Juniper*

**FAC**
(Doc. 66-2)

Step 1

¶ 127
¶ 131
¶ 132

**Step 2**

¶ 3
¶ 4
¶ 128
¶ 131
¶ 132
¶ 133
¶ 140
¶ 141
**¶ 144**
**¶ 145**
**¶ 146**

**Juniper**
(Doc. 64)

Step 1

¶ 144
¶ 148
¶ 149

**Step 2**

¶ 74
¶ 75
¶ 145
¶ 148
¶ 149
¶ 150
¶ 157
¶ 158
**¶ 161**
**¶ 162**
**¶ 163**

---

**FAC column:**

144. The '004 specification describes the dynamic plug-and-play feature of the invention:

> [I]nteroperability among the CPU and co-processors may be facilitated by configuring the CPU to compose and/or structure tasks at a level of abstraction which is independent of the instruction set architecture associated with the various co-processors, thereby allowing the components to communicate at a task level rather than at an instruction level. As such, devices and their associated co-processors may be added to a network on a 'plug and play' basis. ('004; 3:34-40).

145. Dynamically accepting co-processors on a plug-and-play basis improves the operation of a computer network by integrating co-processors with different instruction set architectures into the same network. ('004; 3:43-44).

146. Even assuming, *arguendo*, that claim 1 is directed to an abstract idea (it is not), claim 1 nonetheless includes numerous inventive concepts. For example, the system may include a plurality of cells, wherein some of the cells are capable of performing the same task types as other cells, to thereby create redundancy in the system. This redundancy allows the system to continue functioning seamlessly when cells are removed from the system or are otherwise unavailable. The system also functions seamlessly when cells are dynamically added to the system. ('004; 6:34-55). These inventive concepts had never been proposed before Swarm invented them.

---

**Juniper column:**

161. The '004 specification describes the dynamic plug-and-play feature of the invention:

> [I]nteroperability among the CPU and co-processors may be facilitated by configuring the CPU to compose and/or structure tasks at a level of abstraction which is independent of the instruction set architecture associated with the various co-processors, thereby allowing the components to communicate at a task level rather than at an instruction level. As such, devices and their associated co-processors may be added to a network on a 'plug and play' basis. ('004; 3:34-40).

162. Dynamically accepting co-processors on a plug-and-play basis improves the operation of a computer network by integrating co-processors with different instruction set architectures into the same network. ('004; 3:43-44).

163. Even assuming, *arguendo*, that Claim 1 is directed to an abstract idea (it is not), Claim 1 nonetheless includes numerous inventive concepts. For example, the system may include a plurality of cells, wherein some of the cells are capable of performing the same task types as other cells, to thereby create redundancy in the system. This redundancy allows the system to continue functioning seamlessly when cells are removed from the system or are otherwise unavailable. The system also functions seamlessly when cells are dynamically added to the system. ('004; 6:34-55). These inventive concepts had never been proposed before Swarm invented them.

# *Juniper* **Correctly Determined That Swarm Failed At Step 2**

## *Juniper* Ruling

"2. Claim 1 Lacks an Inventive Concept

Turning to step two, Claim 1 'does not include an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible invention.' *Yu*, 1 F.4th at 1045. '[A]n inventive concept must be evident in the claims.' *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017). Claim 1 of the '777 patent recites a conventional ordering of functions: first having a CPU generate a tasks that are transferred to a task pool so that co-processors, or 'solidarity cells,' can retrieve the tasks and complete them. Dkt. No. 64-3 at 7:41-8:8. Further, the specification of the '777 patent confirms that the system is performed on generic computer networks, stating that the system may be implemented 'on any computer or computer network.' *Id.* at 3:20-24. Claim 1 simply recites ordinary steps, performed in a conventional order, on conventional computer technology. *See, e.g., Two-Way Media*, 874 F.3d at 1339."

**2022 WL 3031211 at \*6**

Step 1
¶ 144
¶ 148
¶ 149

Step 2
¶ 74
¶ 75
¶ 145
¶ 148
¶ 149
¶ 150
¶ 157
¶ 158
¶ 161
¶ 162
¶ 163

14

# *Juniper* Correctly Determined That Swarm Failed At Step 2

## *Juniper* Ruling

"The counterclaims themselves underscore the lack of plausible facts on this score. The counterclaims merely state that each element is more than just 'well-understood, routine, and conventional' steps known in the industry at the time. *See, e.g.*, Dkt. No. 64 § 226. The claims are based purely on citations to the specification of the '777 patent that reiterates the function of the claim element, without explaining how such elements are unconventional. *Id.; see also Broadcom*, — F.3d at , 2022 WL 1105073, at *5. Swarm's suggestion that all of this should be deferred because of factual disputes is misdirected. Swarm says that 'it is not required to prove that its inventive concepts are unconventional,' only to 'properly allege that the claims recite more than well-understood, routine activities.' Dkt. No. 76 at 13. That is precisely where Swarm dropped the ball. It did not plausibly allege, based on non-conclusory and factual statements, that the '777 patent embodies an inventive concept. The conclusory allegations in the counterclaims will not do. *See Cellspin*, 927 F.3d at 1317; *Linquet Techs., Inc. v. Tile, Inc.*, 559 F. Supp. 3d 1101, 1110 (N.D. Cal. 2021)."

**2022 WL 3031211 at *7**

*Juniper*
(Doc. 64)

Step 1
¶ 144
¶ 148
¶ 149

**Step 2**
¶ 74
¶ 75
¶ 145
¶ 148
¶ 149
¶ 150
¶ 157
¶ 158
¶ 161
¶ 162
¶ 163

# *Alice* Step 1

# Are the patent <u>claims</u> directed to an abstract idea?

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l, 573 U.S. 208, 217-18 (2014)*

# Application Of Step 1 — *Yu v. Apple*

## Ineligible Claim from *Yu v. Apple*

1. An improved digital camera comprising:
a first and a second image sensor closely positioned with
   respect to a common plane, said second image sensor
   sensitive to a full region of visible color spectrum;
two lenses, each being mounted in front of one of said two
   image sensors;
said first image sensor producing a first image and said
   second image sensor producing a second image;
an analog-to-digital converting circuitry coupled to said
   first and said second image sensor and digitizing said
   first and said second intensity images to produce cor-
   respondingly a first digital image and a second digital
   image;
an image memory, coupled to said analog-to-digital con-
   verting circuitry, for storing said first digital image and
   said second digital image; and
a digital image processor, coupled to said image memory
   and receiving said first digital image and said second
   digital image, producing a resultant digital image from
   said first digital image enhanced with said second
   digital image.

## *Yu v. Apple*
(affirming Judge Donato 12(b)(6) dismissal)

"We begin our analysis with step one. We agree with the district court that claim 1 is directed to the abstract idea of taking two pictures (which may be at different exposures) and using one picture to enhance the other in some way.

We have approached the Step 1 directed to inquiry by asking what the patent asserts to be the focus of the claimed advance over the prior art. In conducting that inquiry, we must focus on the language of the [a]sserted [c]laims themselves, considered in light of the specification.' Given the claim language and the specification, we conclude that claim 1 is 'directed to a result or effect that itself is the abstract idea and merely invoke[s] generic processes and machinery' rather than 'a specific means or method that improves the relevant technology.'"

# Application Of Step 1 – *Yu v. Apple*

## Ineligible Claim from *Yu v. Apple*

1. An improved digital camera comprising:
a first and a second image sensor closely positioned with respect to a common plane, said second image sensor sensitive to a full region of visible color spectrum;
two lenses, each being mounted in front of one of said two image sensors;
said first image sensor producing a first image and said second image sensor producing a second image;
an analog-to-digital converting circuitry coupled to said first and said second image sensor and digitizing said first and said second intensity images to produce correspondingly a first digital image and a second digital image;
an image memory, coupled to said analog-to-digital converting circuitry, for storing said first digital image and said second digital image; and
a digital image processor, coupled to said image memory and receiving said first digital image and said second digital image, producing a resultant digital image from said first digital image enhanced with said second digital image.

## *Yu v. Apple*
(affirming Judge Donato 12(b)(6) dismissal)

"Yu's contrary arguments are unpersuasive.[2] For example, Yu argues that the asserted claims 'are directed to a patent-eligible improvement in digital camera functionality' by 'providing a specific solution' to problems such as "low resolution caused by low pixel counts' and 'inability to show vivid colors caused by limited pixel depth.' Appellant's Br. 36–38; *see also id.* at 56. But claim 1's solution to those problems is the abstract idea itself—to take one image and 'enhance' it with another. *See* '289 patent col. 10 ll. 54–58 ('[A] digital image processor ... produc[es] a resultant digital image from said first digital image enhanced with said second digital image.').

[2] We note that Yu's claimed invention is couched as an improved machine (an 'improved digital camera'). But whether a device is 'a tangible system (in § 101 terms, a "machine")' is not dispositive. *See Alice*, 573 U.S. at 224, 134 S.Ct. 2347; *In re TLI Commc'ns*, 823 F.3d at 611 ('[N]ot every claim that recites concrete, tangible components escapes the reach of the abstract-idea inquiry.'). As discussed herein, the focus of claim 1 is the abstract idea."

# Application Of Step 1 – *Yu v. Apple*

## Tentative

These new factual allegations are significant because a claimed improvement is considered non-abstract for purposes of step one of the *Alice* framework if it "is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). Put another way, claims "directed to an improvement in the functioning of a computer" and claims "directed to a specific implementation of a solution to a problem in the software arts," which stand in contrast with claims that "simply add[] conventional computer components to well-known business practices," are "not directed to an abstract idea." *Enfish*, 822 F.3d at 1338-39. *See also Ancora Techs., Inc. v. HTC*

                 *       *       *

*muster under Alice* step one, as it is not directed to patent-ineligible subject matter."). Here, the new factual allegations in the FAC plausibly allege that the claimed processing system results in improvements to functionality that are computer-specific. Taken as true, these allegations suggest "the claims are patent-eligible." *Enfish*, 822 F.3d at 1339.

**Tentative at 17-18**

## *Yu v. Apple*
(affirming Judge Donato 12(b)(6) dismissal)

"Yu's contrary arguments are unpersuasive.[2] For example, Yu argues that the asserted claims 'are directed to a patent-eligible improvement in digital camera functionality' by 'providing a specific solution' to problems such as "low resolution caused by low pixel counts' and 'inability to show vivid colors caused by limited pixel depth.' Appellant's Br. 36–38; *see also id.* at 56. But claim 1's solution to those problems is the abstract idea itself—to take one image and 'enhance' it with another. *See* '289 patent col. 10 ll. 54–58 ('[A] digital image processor … produc[es] a resultant digital image from said first digital image enhanced with said second digital image.').

[2] We note that Yu's claimed invention is couched as an improved machine (an 'improved digital camera'). But whether a device is 'a tangible system (in § 101 terms, a "machine")' is not dispositive. *See Alice*, 573 U.S. at 224, 134 S.Ct. 2347; *In re TLI Commc'ns*, 823 F.3d at 611 ('[N]ot every claim that recites concrete, tangible components escapes the reach of the abstract-idea inquiry.'). As discussed herein, the focus of claim 1 is the abstract idea."

# Application Of Step 1 — *Yu v. Apple*

## Amended Complaint from *Yu v. Apple*

12. The claims of the '289 Patent focus on an improvement to the functionality of digital cameras that is achieved by utilizing a new camera architecture that includes multiple lenses and multiple image sensors – arranged in a specific configuration, and of a specific type – to produce digital images having improved quality compared with prior digital cameras. While digital cameras having multiple lenses and multiple image sensors existed prior to the filing date of the '289 Patent, the conventional approach at that time was to use image sensors that are responsive to only a portion of the visible color spectrum, such as a red sensor, a green sensor, and a blue sensor. The '289 Patent, however, departed from the conventional approach by utilizing at least one image sensor that is "sensitive to a full region of visible color spectrum." This unconventional approach enabled the improved digital camera of the '289 patent to produce images having improved qualities, such as higher resolutions and greater dynamic ranges, compared with prior digital cameras, including those that included multiple lenses and multiple image sensors. Moreover, many prior multiple lens and multiple image sensor digital cameras utilized complex lens arrangements that included a prism for separating light into its component colors and then directing those components onto the respective image sensors. Not only did this approach greatly increase the complexity of the system, but it also introduced the possibility of large registration errors between the images generated by the multiple image sensors. The '289 Patent, on the other hand, avoided the need for such a complex lens arrangement by making the image sensors "closely positioned with respect to a common plane." In other words, the

*Yu Doc. 61 at 3*

## *Yu v. Apple*
### (affirming Judge Donato 12(b)(6) dismissal)

"Yu also argues that the district court erred at the pleadings stage in making certain adverse findings of fact and failing to accept certain allegations in the complaint. … Yu's arguments are misplaced. … Last, '[i]n ruling on a 12(b)(6) motion, a court need not accept as true allegations that contradict matters properly subject to judicial notice or by exhibit, such as the claims and the patent specification.' *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) (cleaned up). Here, the district court considered the intrinsic record and concluded that the claims were directed to patent-ineligible subject matter, despite Yu's allegations to the contrary. This is not error."

# Original Decision Was Correct And No New Pleadings Change The Outcome

## Tentative

This analysis correctly applied the law to the then-applicable facts,[4] but the facts have now changed. The original complaint did not mention the phrase "functionality" and included no allegations about whether the patents resulted in computer-specific functionality improvements. (Doc. 1.) The proposed FAC, in contrast, specifically alleges that, "[t]aken together, the controller, task pool, and co-processors confer a substantial advantage over prior art processing systems by allowing different types of co-processors to interact with the task pool without significantly compromising their individual performance. Claim 1 [of the '004 Patent] thus focuses on improvements to computer functionality, as opposed to merely being directed to an abstract idea." (Doc. 66-1 at 31 ¶ 127.) Elsewhere, the proposed FAC elaborates as to why these efficiency improvements are computer-specific: "[C]onventional processors include a CPU and one or more co-processors, where the CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Consequently, a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors. To address these shortcomings, [the '004 Patent] invented a revolutionary new parallel processing paradigm, including co-processors configured to proactively retrieve new tasks from the task pool without having to communicate directly with (or wait for) the CPU." (*Id.* at 32 ¶¶ 131-32.) Finally, and perhaps in an effort to

**Tentative at 16-17**

## Swarm's Original Complaint

72.     Mr. Iñiguez prepared for his interview by reading books, papers, and performing extensive research in the field of computer architecture. He was struck by the inefficiencies associated with state-of-the-art computer processing architectures. He intuitively knew there was a better way for computer processors to cooperate with each other and with a central controller to perform complex processing tasks. He also believed that the swarm intelligence exhibited by ant colonies would play an important role in his new processing paradigm.

73.     Drawing on his computer industry experience, Mr. Iñiguez identified two major drawbacks with existing multiprocessing frameworks. First, a significant portion of the CPU's processing cycles (bandwidth) was consumed assigning tasks to the "slave" processors. Second, the processors were often idle while waiting for a new task.

74.     To address these shortcomings, Mr. Iñiguez invented a revolutionary new parallel processing paradigm, generally characterized by co-processors configured to proactively seek new tasks, without having to communicate directly with (or wait for) the CPU. These co-processors include hardware and/or software components which are variously referred to as "autonomous agents" configured to retrieve "tasks" or "device shadows."

**Doc. 1 at 13, *cited in* Swarm Opp. to MTD at 4, 6, 9;**
**see also Doc. 1 at 19-20 (discussing claim 1 of '004 patent specifically)**

# Original Decision Was Correct And No New Pleadings Change The Outcome

## Tentative

This analysis correctly applied the law to the then-applicable facts,[4] but the facts have now changed. The original complaint did not mention the phrase "functionality" and included no allegations about whether the patents resulted in computer-specific functionality improvements. (Doc. 1.) The proposed FAC, in contrast, specifically alleges that, "[t]aken together, the controller, task pool, and co-processors confer a substantial advantage over prior art processing systems by allowing different types of co-processors to interact with the task pool without significantly compromising their individual performance. Claim 1 [of the '004 Patent] thus focuses on improvements to computer functionality, as opposed to merely being directed to an abstract idea." (Doc. 66-1 at 31 ¶ 127.) Elsewhere, the proposed FAC elaborates as to why these efficiency improvements are computer-specific: "[C]onventional processors include a CPU and one or more co-processors, where the CPU partitions the computational requirements into tasks and distributes the tasks to co-processors.  Consequently, a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors.  To address these shortcomings, [the '004 Patent] invented a revolutionary new parallel processing paradigm, including co-processors configured to proactively retrieve new tasks from the task pool without having to communicate directly with (or wait for) the CPU." (*Id.* at 32 ¶¶ 131-32.) Finally, and perhaps in an effort to

**Tentative at 16-17**

## Swarm's Original Complaint

72.    Mr. Iñiguez prepared for his interview by reading books, papers, and performing extensive research in the field of computer architecture.  He was struck by the inefficiencies associated with state-of-the-art computer processing architectures.  He intuitively knew there was a better way for computer processors to cooperate with each other and with a central controller to perform complex processing tasks. He also believed that the swarm intelligence exhibited by ant colonies would play an important role in his new processing paradigm.

73.    Drawing on his computer industry experience, Mr. Iñiguez identified two major drawbacks with existing multiprocessing frameworks.  First, a significant portion of the CPU's processing cycles (bandwidth) was consumed assigning tasks to the "slave" processors.  Second, the processors were often idle while waiting for a new task.

74.    To address these shortcomings, Mr. Iñiguez invented a revolutionary new parallel processing paradigm, generally characterized by co-processors configured to proactively seek new tasks, without having to communicate directly with (or wait for) the CPU. These co-processors include hardware and/or software components which are variously referred to as "autonomous agents" configured to retrieve "tasks" or "device shadows."

**Doc. 1 at 13, *cited in* Swarm Opp. to MTD at 4, 6, 9;
see also Doc. 1 at 19-20 (discussing claim 1 of '004 patent specifically)**

# Original Decision Was Correct And No New Pleadings Change The Outcome

## Tentative

This analysis correctly applied the law to the then-applicable facts,[4] but the facts have now changed. The original complaint did not mention the phrase "functionality" and included no allegations about whether the patents resulted in computer-specific functionality improvements. (Doc. 1.) The proposed FAC, in contrast, specifically alleges that, "[t]aken together, the controller, task pool, and co-processors confer a substantial advantage over prior art processing systems by allowing different types of co-processors to interact with the task pool without significantly compromising their individual performance. Claim 1 [of the '004 Patent] thus focuses on improvements to computer functionality, as opposed to merely being directed to an abstract idea." (Doc. 66-1 at 31 ¶ 127.) Elsewhere, the proposed FAC elaborates as to why these efficiency improvements are computer-specific: "[C]onventional processors include a CPU and one or more co-processors, where the CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Consequently, a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors. To address these shortcomings, [the '004 Patent] invented a revolutionary new parallel processing paradigm, including co-processors configured to proactively retrieve new tasks from the task pool without having to communicate directly with (or wait for) the CPU." (*Id.* at 32 ¶¶ 131-32.) Finally, and perhaps in an effort to

**Tentative at 16-17**

## Swarm's Original Complaint

72.    Mr. Iñiguez prepared for his interview by reading books, papers, and performing extensive research in the field of computer architecture. He was struck by the inefficiencies associated with state-of-the-art computer processing architectures. He intuitively knew there was a better way for computer processors to cooperate with each other and with a central controller to perform complex processing tasks. He also believed that the swarm intelligence exhibited by ant colonies would play an important role in his new processing paradigm.

73.    Drawing on his computer industry experience, Mr. Iñiguez identified two major drawbacks with existing multiprocessing frameworks. First, a significant portion of the CPU's processing cycles (bandwidth) was consumed assigning tasks to the "slave" processors. Second, the processors were often idle while waiting for a new task.

74.    To address these shortcomings, Mr. Iñiguez invented a revolutionary new parallel processing paradigm, generally characterized by co-processors configured to proactively seek new tasks, without having to communicate directly with (or wait for) the CPU. These co-processors include hardware and/or software components which are variously referred to as "autonomous agents" configured to retrieve "tasks" or "device shadows."

**Doc. 1 at 13,** *cited in* **Swarm Opp. to MTD at 4, 6, 9;**
*see also* **Doc. 1 at 19-20 (discussing claim 1 of '004 patent specifically)**

# Original Decision Was Correct And No New Pleadings Change The Outcome

## Tentative

This analysis correctly applied the law to the then-applicable facts,[4] but the facts have now changed. The original complaint did not mention the phrase "functionality" and included no allegations about whether the patents resulted in computer-specific functionality improvements. (Doc. 1.) The proposed FAC, in contrast, specifically alleges that, "[t]aken together, the controller, task pool, and co-processors confer a substantial advantage over prior art processing systems by allowing different types of co-processors to interact with the task pool without significantly compromising their individual performance. Claim 1 [of the '004 Patent] thus focuses on improvements to computer functionality, as opposed to merely being directed to an abstract idea." (Doc. 66-1 at 31 ¶ 127.) Elsewhere, the proposed FAC elaborates as to why these efficiency improvements are computer-specific: "[C]onventional processors include a CPU and one or more co-processors, where the CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Consequently, a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors. To address these shortcomings, [the '004 Patent] invented a revolutionary new parallel processing paradigm, including co-processors configured to proactively retrieve new tasks from the task pool without having to communicate directly with (or wait for) the CPU." (*Id.* at 32 ¶¶ 131-32.) Finally, and perhaps in an effort to

*Tentative at 16-17*

## Swarm's Original Complaint

72.    Mr. Iñiguez prepared for his interview by reading books, papers, and performing extensive research in the field of computer architecture. He was struck by the inefficiencies associated with state-of-the-art computer processing architectures. He intuitively knew there was a better way for computer processors to cooperate with each other and with a central controller to perform complex processing tasks. He also believed that the swarm intelligence exhibited by ant colonies would play an important role in his new processing paradigm.

73.    Drawing on his computer industry experience, Mr. Iñiguez identified two major drawbacks with existing multiprocessing frameworks. First, a significant portion of the CPU's processing cycles (bandwidth) was consumed assigning tasks to the "slave" processors. Second, the processors were often idle while waiting for a new task.

74.    To address these shortcomings, Mr. Iñiguez invented a revolutionary new parallel processing paradigm, generally characterized by co-processors configured to proactively seek new tasks, without having to communicate directly with (or wait for) the CPU. These co-processors include hardware and/or software components which are variously referred to as "autonomous agents" configured to retrieve "tasks" or "device shadows."

**Doc. 1 at 13, *cited in* Swarm Opp. to MTD at 4, 6, 9;
*see also* Doc. 1 at 19-20 (discussing claim 1 of '004 patent specifically)**

# Original Decision Was Correct And No New Pleadings Change The Outcome

## Tentative

with (or wait for) the CPU." (*Id.* at 32 ¶¶ 131-32.) Finally, and perhaps in an effort to address the criticism in the September 2021 order that any claimed improvements in computer functionality did not appear in the patents themselves,[5] the FAC specifically identifies where claims of computer-specific improvements related to bandwidth consumption appear in the '004 Patent. (*Id.* at 31 ¶ 131, citing '004 Patent at 1:56-59 and at 1:63-2:1.)

**Tentative at 17**

[5]   Doc. 64 at 7-8 ("Here, the Complaint alleges that the Patents are designed to address two problems related to parallel computer processing [*i.e.*, occupied processing bandwidth and idling processors] . . . . But, unlike in *Aatrix*, there are no allegations of a specific inventive concept within the Patents.").

## Previous Order Granting Motion to Dismiss

### b. Inventive Concept

After determining that a claim is abstract, step two of *Alice* asks whether the idea adds something "significantly more" such that the abstract idea is transformed into an eligible patent. *Alice*, 573 U.S. at 217–18. This concept "must be evident in the claims."

\*          \*          \*

Here, the Complaint alleges that the Patents are designed to address two problems related to parallel computer processing. First, the Complaint alleges that too much processing bandwidth was being occupied in assigning tasks to "slave" processors. (Doc. 1 at ¶ 73). Second, many processors were being left idle while awaiting a task. (*Id.*) Swarm emphasizes, and the Complaint alleges, that the Patents solve these problems and increase a computer system's performance. (Doc. 36 at 14). But, unlike in *Aatrix*, there are no allegations of a specific inventive concept within the Patents. Although Swarm makes the conclusory assertion that its Patents contain claim elements that, when combined, "are not well-understood, routine or conventional," Swarm fails to elaborate. (Doc. 36 at 16) (quoting *Aatrix* at 1128). Swarm has not identified a *specific* technological improvement comparable to the data file in *Aatrix*.

The Court doubts that Swarm could point to a specific inventive concept. It is plain from the specification of the '004 Patent that it requires "no improved computer resources . . . , just already available computers, with their already available basic functions, to use as tools in executing the claimed process." *SAP Am.*, 898 F.3d at 1169–70. For example,

**Doc. 64 at 6, 8**

25

# Asserted Patent Claims Are Directed To An Abstract Idea

**Tentative**

allegations in the FAC remedy this deficiency for the reasons stated above. <mark>Identifying a task from the task pool and completing the task may be analogous to a project manager's use of a scrum board</mark>, but Plaintiff has now plausibly alleged that the analogy falls short in light of the added considerations of autonomy and seamless functioning, which suggest an unconventional concept apart from the abstract idea. <mark>Humans couldn't very well utilize a scrum board with absolutely no communication or direction from either the manager or the scrum board itself about what the tasks are and what the employees are to do with them before, during, or after completion. Nor could humans work efficiently with employees who are quickly brought in and trained under different instruction sets, as the co-processors are alleged do here.</mark> *See, e.g., Alice*, 573 U.S. at 217 ("[A]n invention is not rendered

**Tentative at 20**



Controller   Task Pool   Co-Processor

Swarm Architecture

Doc. 66-2 at 3



Project Manager   Scrum Board   Team Members

**Abstract Idea – Project Management Using Scrum Board**

# *Alice* Step 2

# Do the patent <u>claims</u> add anything "significantly more" and "inventive" to that abstract idea?

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 221-26 (2014)

# Application Of Step 2 – *Yu v. Apple*

## Ineligible Claim from *Yu v. Apple*

1. An improved digital camera comprising:
a first and a second image sensor closely positioned with respect to a common plane, said second image sensor sensitive to a full region of visible color spectrum;
two lenses, each being mounted in front of one of said two image sensors;
said first image sensor producing a first image and said second image sensor producing a second image;
an analog-to-digital converting circuitry coupled to said first and said second image sensor and digitizing said first and said second intensity images to produce correspondingly a first digital image and a second digital image;
an image memory, coupled to said analog-to-digital converting circuitry, for storing said first digital image and said second digital image; and
a digital image processor, coupled to said image memory and receiving said first digital image and said second digital image, producing a resultant digital image from said first digital image enhanced with said second digital image.

## *Yu v. Apple*
### (affirming Judge Donato 12(b)(6) dismissal)

" Turning to step two, we conclude that claim 1 does not include an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible invention. Because claim 1 is recited at a high level of generality and merely invokes well-understood, routine, conventional components to apply the abstract idea identified above, *see, e.g.*, '289 patent claim 1; *id.* at col. 2 ll. 3–5; J.A. 117–20, claim 1 fails at step two, *see, e.g.*, *Alice*, 573 U.S. at 225–26, 134 S.Ct. 2347; *Mayo*, 566 U.S. at 73, 132 S.Ct. 1289; *see also, e.g.*, *In re TLI Commc'ns*, 823 F.3d at 615 (concluding patent claims ineligible at step two in part because 'the recited physical components behave exactly as expected according to their ordinary use').

Yu's contrary arguments again fail. For example, Yu argues that '[t]he unconventional nature of the digital camera architecture is demonstrated by the prosecution history of the '289 Patent' because the asserted claims 'were allowed ... over multiple prior art references.' Appellant's Br. 56. But even if claim 1 recites novel subject matter, that fact is insufficient by itself to confer eligibility. *See SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018); *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1340 (Fed. Cir. 2017) ('Eligibility and novelty are separate inquiries.')."

# Application Of Step 2 — *Yu v. Apple*

## Ineligible Claim from *Yu v. Apple*

1. An improved digital camera comprising:

a first and a second image sensor closely positioned with respect to a common plane, said second image sensor sensitive to a full region of visible color spectrum;

two lenses, each being mounted in front of one of said two image sensors;

said first image sensor producing a first image and said second image sensor producing a second image;

an analog-to-digital converting circuitry coupled to said first and said second image sensor and digitizing said first and said second intensity images to produce correspondingly a first digital image and a second digital image;

an image memory, coupled to said analog-to-digital converting circuitry, for storing said first digital image and said second digital image; and

a digital image processor, coupled to said image memory and receiving said first digital image and said second digital image, producing a resultant digital image from said first digital image enhanced with said second digital image.

## *Yu v. Apple*
(affirming Judge Donato 12(b)(6) dismissal)

"Yu further argues that the claimed 'hardware configuration is vital to performing the claimed image enhancement' and that, '[t]herefore, the claimed combination of limitations … is unconventional.' Appellant's Br. 59. But the conclusion does not follow from the premise. Conventional computer equipment can be 'vital' to an advance that is still abstract, but not suffice to avoid ineligibility at Alice step two. *See, e.g.*, *SAP*, 898 F.3d at 1168–70 (ineligibility holding where abstract, mathematical data manipulation had to be implemented on computers, but only conventional computer equipment was required). Here, the claimed hardware configuration itself is not an advance and does not itself produce the asserted advance of enhancement of one image by another, which, as explained, is an abstract idea. The claimed configuration does not add sufficient substance to the underlying abstract idea of enhancement—the generic hardware limitations of claim 1 merely serve as 'a conduit for the abstract idea.' *In re TLI Commc's*, 823 F.3d at 612. In other words, '[t]he main problem that [Yu] cannot overcome is that the claim—as opposed to something purportedly described in the specification—is missing an inventive concept.' *Two-Way Media*, 874 F.3d at 1338. In sum, we see no inventive concept in claim 1 that would confer patent eligibility at step two."

# Asserted Patents Do Not Add Any (Significantly More) Inventive Limitations

## *Chamberlain v. Techtronic*

"The appropriate question is not whether the entire claim as a whole was 'well-understood, routine [and] conventional' to a skilled artisan (i.e., whether it lacks novelty)," rather whether claim adds something inventive "apart from" abstract idea.

**935 F.3d 1341, 1348-49 (Fed. Cir. 2019)**

## *BSG Tech v. BuySeasons*

"[The patentee] points to the … patent specifications to argue that the asserted claims recite unconventional features that provide benefits over conventional prior art databases. But  the relevant inquiry is not whether the claimed invention as a whole is unconventional or non-routine. …."

"[A] claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept …."

**899 F.3d 1281, 1290 (Fed. Cir. 2018)**

# Asserted Patent Claims Fail Step 2

## Tentative

Alternatively, even if the new factual allegations in the FAC were deemed insufficient under the first step of the *Alice* framework, the FAC sufficiently expounds upon inventive concepts to survive dismissal under step two. For example, the FAC now alleges that the claims are specifically directed to autonomous co-processing that allows for an unlimited number of controllers and co-processors to work together quickly, simultaneously, seamlessly (*e.g.*, when some cells cannot complete a task and are then removed), and without instruction by the CPU or by the task pool. (*See, e.g.*, Doc. 66-1 at 32-33 ¶¶ 131-33, 35-36 ¶ 146.) The FAC also adds detailed descriptions of how a co-processor may be configured to (1) retrieve a task from the task pool when it is otherwise idle (*id.* at 30 ¶ 128), (2) proactively retrieve new tasks and mark them as complete, saving a significant amount of CPU bandwidth from being consumed by task distribution and by responding to interrupts from co-processors (*id.* at 32-33 ¶¶ 131-133, 35 ¶¶ 140-41), and (3) communicate with other co-processors on a plug-and-play basis despite having different instruction sets (*id.* at 36 ¶ 144-45). And the FAC also plausibly alleges that these activities previously known to the industry. Among other things, the FAC now alleges that "[p]rior to [the] invention, conventional multiprocessors included a [CPU] and one or more

*Tentative at 18-19*



Swarm Architecture



### *Yu v. Apple*
(affirming Judge Donato 12(b)(6) dismissal)

"The claimed configuration does not add sufficient substance to the underlying abstract idea of enhancement—the generic hardware limitations of claim 1 merely serve as 'a conduit for the abstract idea.' *In re TLI Commc's*, 823 F.3d at 612."

# Asserted Patent Claims Fail Step 2

## Tentative

Alternatively, even if the new factual allegations in the FAC were deemed insufficient under the first step of the *Alice* framework, the FAC sufficiently expounds upon inventive concepts to survive dismissal under step two. For example, the FAC now alleges that the claims are specifically directed to autonomous co-processing that allows for an unlimited number of controllers and co-processors to work together quickly, simultaneously, seamlessly (*e.g.*, when some cells cannot complete a task and are then removed), and without instruction by the CPU or by the task pool. (*See, e.g.*, Doc. 66-1 at 32-33 ¶¶ 131-33, 35-36 ¶ 146.) The FAC also adds detailed descriptions of how a co-processor may be configured to (1) retrieve a task from the task pool when it is otherwise idle (*id.* at 30 ¶ 128), (2) proactively retrieve new tasks and mark them as complete, saving a significant amount of CPU bandwidth from being consumed by task distribution and by responding to interrupts from co-processors (*id.* at 32-33 ¶¶ 131-133, 35 ¶¶ 140-41), and (3) communicate with other co-processors on a plug-and-play basis despite having different instruction sets (*id.* at 36 ¶ 144-45). And the FAC also plausibly alleges that these activities previously known to the industry. Among other things, the FAC now alleges that "[p]rior to [the] invention, conventional multiprocessors included a [CPU] and one or more

**Tentative at 18-19**

## *Yu v. Apple*
(affirming Judge Donato 12(b)(6) dismissal)

"In other words, '[t]he main problem that [Yu] cannot overcome is that the claim—as opposed to something purportedly described in the specification—is missing an inventive concept.' *Two-Way Media*, 874 F.3d at 1338."

**1 F.4th 1040, 1045 (Fed. Cir. 2021)**

## *Two-Way Media v. Comcast*

"To save a patent at step two, an inventive concept must be evident in the claims.

\*          \*          \*

The main problem that Two-Way Media cannot overcome is that the claim—as opposed to something purportedly described in the specification—is missing an inventive concept."

**874 F.3d 1329, 1338-39 (Fed. Cir. 2017) (granting judgment on pleadings)**

# Asserted Patent Claims Fail Step 2

**Tentative**

(3) communicate with other co-processors on a plug-and-play basis despite having different instruction sets (*id.* at 36 ¶ 144-45). And the FAC also plausibly alleges that these activities previously known to the industry. Among other things, the FAC now alleges that "[p]rior to [the] invention, conventional multiprocessors included a [CPU] and one or more co-processors . . . . That is, the processing 'architecture' consisted of a primary controller which distributed tasks directly to a plurality of co-processors. This conventional approach is disadvantageous in that a significant amount of the CPU's processing cycles (bandwidth) is consumed by task distribution, while the co-processors often remain idle while waiting for a new task from the CPU. [The Patents] modified the arrangement of components (the architecture) of multiprocessing systems . . . by interposing an intermediate device—the task pool—between the CPU and the co-processors. In addition, [the Patents] modified the way each of those components operate, both individually and in combination with each other. As a result, [the Patents create] a new multiprocessor system architecture which had never existed before." (Doc. 66-1 at 3 ¶¶ 3-4.)

**Tentative at 19**

## The abstract idea



Swarm Architecture



## Not in the claims

# Asserted Patents Do Not Add Any (Significantly More) Inventive Limitations

**FAC**

A. **Swarm Invented a New Processing Architecture.**

125. The preamble of Claim 1 recites:

A processing system, comprising: ('004; 14:10).

**Doc. 66-2 at 28**

**Generic computer component**

software program. The system 10 may be implemented on a personal computer, smart phone, tablet, or Internet-of-Things device, in which case the CPU 11 may be any

\* \*    \*

It is further contemplated that the system 10 may be implemented retroactively on any computer or computer network having an operating system that may be modified or otherwise configured to implement the functionality described herein. As is known in the art, the data to be

**'004 Patent at 5:19-21, 5:45-49**

**'375 System Claim 14 (Ineligible) from *Alice***

14. A data processing system to enable the exchange of an obligation between parties, the system comprising:
  a communications controller,
  a data storage unit having stored therein
    (a) information about a first account for a first party,

# Asserted Patents Do Not Add Any (Significantly More) Inventive Limitations

## FAC

A.   Swarm Invented a New Processing Architecture.

125.   The preamble of Claim 1 recites:

   A processing system, comprising: ('004; 14:10).

Doc. 66-2 at 28

**B.   Swarm Invented a New Processing Architecture Comprising a Task Pool Interposed Between the CPU and the Co-Processors.**

129.   Claim 1 further recites:

   a task pool ('004; 14:11).

**Doc. 66-2 at 29**

## Generic computer component

Referring now to FIGS. **1** and **2**, the task pool **13** may occupy a region of physical memory that is accessible by the CPU **11**. Alternatively, the task pool **13** may be accessible by MAC address or IP address. Multiple embodiments are envisioned for the task pool **13**; it may be physically located with the CPU in the same 2D or 3D monolithic IC, or it may be implemented as a stand-alone IC and be physically interconnected to a computer board, smart phone, tablet, router or Internet-of-Things device. In a further alternative embodiment, the task pool may be a stand-alone multi-port, wired and/or wireless connected device which may be shared among multiple CPU **11** systems, or dedicated to a given CPU **11**. The task pool **13** may also be addressable by the cells **12**. The task pool **13** may be disposed in a dedicated hardware block to provide maximum access speed by the CPU **11** and cells **12**. Alternatively, the task pool **13** may be software based, wherein the contents of the task pool **13** are stored in memory, analogous to the hardware-based embodiment, but represented by data structures.

**'004 Patent at 6:56-7:7**

# Asserted Patents Do Not Add Any (Significantly More) Inventive Limitations

## FAC

A.   **Swarm Invented a New Processing Architecture.**

125.   The preamble of Claim 1 recites:

A processing system, comprising: ('004; 14:10).

<div align="right">Doc. 66-2 at 28</div>

---

B.   **Swarm Invented a New Processing Architecture Comprising a Task Pool Interposed Between the CPU and the Co-Processors.**

129.   Claim 1 further recites:

a task pool ('004; 14:11).

<div align="right">Doc. 66-2 at 29</div>

---

## Swarm's First Request for Production of Documents to Defendants

20.   "Task Pool" means any list, database, memory module, cache, random access memory, or other data or memory structure or construct, whether implemented in hardware, firmware, software, and/or executable code, that is configured to hold, store, monitor, track, display, populate with, and/or update a plurality of individual tasks.

**Swarm's First Request for Production of Documents to Defendants at 4**



# Asserted Patents Do Not Add Any (Significantly More) Inventive Limitations

## FAC

A.    **Swarm Invented a New Processing Architecture.**

125.    The preamble of Claim 1 recites:

A processing system, comprising: ('004; 14:10).

*Doc. 66-2 at 28*

B.    **Swarm Invented a New Processing Architecture Comprising a Task Pool Interposed Between the CPU and the Co-Processors.**

129.    Claim 1 further recites:

a task pool ('004; 14:11).

*Doc. 66-2 at 29*

C.    **Swarm Invented a New Processing Architecture Including a Controller Configured to Place Tasks Into the Task Pool.**

134.    Claim 1 further recites:

a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks ('004; 14:12-13).

*Doc. 66-2 at 30*

## Generic computer component

Referring now to FIG. **4**, an internet of things network **400** includes a controller (CPU) **402**, a task pool **408**, and various devices **410-422**, some or all of which include an associated or embedded microcontroller, such as an integrated circuit

*'004 Patent at 11:35-38*

The CPU **11** may be any single or multi-core processor, applications processor or microcontroller, used to execute a software program. The system **10** may be implemented on a personal computer, smart phone, tablet, or Internet-of-Things device, in which case the CPU **11** may be any personal computer, central processor, or processor cluster, such as an Intel® Pentium® or multi-core processor local to or remote from the immediate computing environment.

*'004 Patent at 5:17-24*

In the illustrated embodiment, the controller **402** may be a smartphone, tablet, laptop, or other device which may include a display **404** and a user interface (e.g., keypad) **406**

*'004 Patent at 11:46-48*

# Asserted Patents Do Not Add Any (Significantly More) Inventive Limitations

## FAC

A.   Swarm Invented a New Processing Architecture.

125.   The preamble of Claim 1 recites:

A processing system, comprising: ('004; 14:10).

*Doc. 66-2 at 28*

B.   Swarm Invented a New Processing Architecture Comprising a Task Pool Interposed Between the CPU and the Co-Processors.

129.   Claim 1 further recites:

a task pool ('004; 14:11).

*Doc. 66-2 at 29*

C.   Swarm Invented a New Processing Architecture Including a Controller Configured to Place Tasks Into the Task Pool.

134.   Claim 1 further recites:

a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks ('004; 14:12-13).

*Doc. 66-2 at 30*

## *Alice* Decision

"[W]hat petitioner characterizes as specific hardware—a 'data processing system' with a 'communications controller' and 'data storage unit,' for example—is purely functional and generic. Nearly every computer will include a 'communications controller' and 'data storage unit' capable of performing the basic calculation, storage, and transmission functions required by the method claims. As a result, none of the hardware recited by the system claims 'offers a meaningful limitation beyond generally linking "the use of the [method] to a particular technological environment,"' that is, implementation via computers."

*Alice*, 573 U.S. at 226 (internal citation omitted; second alteration original)

### '375 System Claim 14 (Ineligible) from *Alice*

14. A data processing system to enable the exchange of an obligation between parties, the system comprising:

a communications controller,

a data storage unit having stored therein

(a) information about a first account for a first party,

# FAC Would Be Futile

## Previous Court Order Granting Motion to Dismiss



The Court doubts that Swarm could point to a specific inventive concept.  It is plain from the specification of the '004 Patent that it requires "no improved computer resources . . . , just already available computers, with their already available basic functions, to use as tools in executing the claimed process."  *SAP Am.*, 898 F.3d at 1169–70.  For example, **Doc. 64 at 8**

| FAC (Doc. 66-2) | | Juniper (Doc. 64) |
|---|---|---|
| ¶¶ 3–4 | = | ¶¶ 74–75 |
| ¶¶ 127–28 | = | ¶¶ 144–45 |
| ¶¶ 131–33 | = | ¶¶ 148–50 |
| ¶¶ 140–41 | = | ¶¶ 157–58 |
| ¶¶ 144–46 | = | ¶¶ 161–63 |



## Juniper Ruling

"Because the '777 patent is directed to an abstract idea and lacks an inventive concept, the counterclaims are dismissed. In light of the plain language of the claims in the patent, the Court has some doubt that Swarm can amend around this problem. Even so, Swarm may file amended counterclaims by August 15, 2022. Failure to meet this deadline will result in dismissal with prejudice under Rule 41(b)." **2022 WL 3031211 at \*7**

# FAC Would Be Futile

**①** *Are the patent <u>claims</u> directed to an abstract idea?* **Yes.**



**②** *Do the patent claims add anything "significantly more" and "inventive" to that abstract idea?* **No.**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l, 573 U.S. 208, 217-18, 221, 226 (2014)*

# Federal Circuit Decisions Holding Claims Ineligible On Rule 12 Motions Under *Alice*

| | | |
|---|---|---|
| *Repifi Vendor Logistics v. IntelliCentrics* (2022) | *Braemar Mfg., LLC v. ScottCare Corp.* (2020) | *Smart Sys. Innovations, LLC v. Chicago Transit Authority* (2017) |
| *Universal Secure v. Apple* (2021) | *Dropbox, Inc. v. Synchronoss Techs., Inc.* (2020) | *Secured Mail Sols. LLC v. Universal Wilde, Inc.* (2017) |
| *MyMail v. ooVoo* (2021) | *Ubisoft Entm't, S.A. v. Yousician Oy* (2020) | *Cleveland Clinic Found. v. True Health Diag. LLC* (2017) |
| *PersonalWeb Techs v. Google* (2021) | *British Telecomm'ns PLC v. IAC/InterActiveCorp* (2020) | *RecogniCorp, LLC v. Nintendo Co., Ltd.* (2017) |
| *Sensormatic Electronics v. Wyze Labs* (2021) | *Elec. Comm'n Techs., LLC v. ShoppersChoice.com* (2020) | *West View Research, LLC v. Audi AG* (2017) |
| *Aftechmobile v. Salesforce.com* (2021) | *Cisco Systems, Inc. v. Uniloc 2017 LLC* (2020) | *Coffelt v. NVIDIA Corp.* (2017) |
| *Yu v. Apple Inc.* (2021) | *WhitServe LLC v. Donuts Inc.* (2020) | *Intellectual Ventures I LLC v. Erie Indemnity Co.* (2017) |
| *Free Stream Media v. Alphonso* (2021) | *Bridge & Post, Inc. v. Verizon Comm'ns, Inc.* (2019) | *Evolutionary Intelligence v. Sprint Nextel Corp.* (2017) |
| *WhitServe LLC v. Dropbox, Inc.* (2021) | *ChargePoint, Inc. v. SemaConnect, Inc.* (2019) | *FairWarning IP, LLC v. Iatric Systems, Inc.* (2016) |
| *Enco Sys., Inc. v. DaVincia, LLC* (2021) | *Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.* (2019) | *Affinity Labs of Texas, LLC v. DIRECTV, LLC* (2016) |
| *VeriPath, Inc. v. Didomi* (2021) | *Voit Techs., LLC v. Del-Ton, Inc.* (2019) | *Affinity Labs of Texas, LLC v. Amazon.com Inc.* (2016) |
| *Boom! Payments, Inc. v. Stripe, Inc.* (2021) | *Athena Diagnostics, Inc. v. Mayo Coll. Servs., LLC* (2019) | *TDE Petroleum Data Sols. v. AKM Enterprise, Inc.* (2016) |
| *Mortg. Appl. Techs., LLC v. MeridianLink, Inc.* (2021) | *Glasswall Sols. Ltd. v. Clearswift Ltd.* (2018) | *Shortridge v. Found. Construction Payroll Serv.* (2016) |
| *NetSoc, LLC v. Match Grp., LLC* (2020) | *SAP Am., Inc. v. InvestPic, LLC* (2018) | *In re TLI Commc'ns LLC Patent Litig.* (2016) |
| *Simio, LLC v. FlexSim Software Prods., Inc.* (2020) | *Interval Licensing LLC v. AOL, Inc.* (2018) | *Genetic Techs. Ltd. v. Merial L.L.C.* (2016) |
| *Adaptive Streaming Inc. v. Netflix, Inc.* (2020) | *Burnett v. Panasonic Corp.* (2018) | *Vehicle Intell. & Safety LLC v. Mercedes-Benz USA* (2015) |
| *Fast 101 Pty Ltd. v. CitiGroup Inc.* (2020) | *Voter Verified, Inc. v. Election Sys. & Software LLC* (2018) | *Internet Patents Corp. v. Active Network, Inc.* (2015) |
| *Tenstreet, LLC v. DriverReach, LLC* (2020) | *Maxon, LLC v. Funai Corp., Inc.* (2018) | *OIP Techs., Inc. v. Amazon.com, Inc.* (2015) |
| *W. Express Bancshares, LLC v. Green Dot Corp.* (2020) | *Automated Tracking Sols., LLC v. Coca-Cola Co.* (2018) | *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n* (2014) |
| *Data Scape Ltd. v. W. Digital Corp.* (2020) | *Intellectual Ventures I LLC v. Erie Indemnity Co.* (2017) | *Ultramercial, Inc. v. Hulu, LLC* (2014) |
| *CardioNet, LLC v. InfoBionic, Inc.* (2020) | *Two-Way Media Ltd. v. Comcast Cable Comm'ns, LLC* (2017) | *buySAFE, Inc. v. Google, Inc.* (2014) |

# *DDR* Is Distinguishable

## Representative Claim from *DDR*

**19**. A system useful in an outsource provider serving web pages offering commercial opportunities, the system comprising:

(a) a computer store containing data, for each of a plurality of first web pages, defining a plurality of visually perceptible elements, which visually perceptible elements correspond to the plurality of first web pages;

  (i) wherein each of the first web pages belongs to one of a plurality of web page owners;

  (ii) wherein each of the first web pages displays at least one active link associated with a commerce object associated with a buying opportunity of a selected one of a plurality of merchants; and

  (iii) wherein the selected merchant, the outsource provider, and the owner of the first web page displaying the associated link are each third parties with respect to one other;

(b) a computer server at the outsource provider, which computer server is coupled to the computer store and programmed to:

  (i) receive from the web browser of a computer user a signal indicating activation of one of the links displayed by one of the first web pages;

  (ii) automatically identify as the source page the one of the first web pages on which the link has been activated;

  (iii) in response to identification of the source page, automatically retrieve the stored data corresponding to the source page; and

  (iv) using the data retrieved, automatically generate and transmit to the web browser a second web page that displays: (A) information associated with the commerce object associated with the link that has been activated, and (B) the plurality of visually perceptible elements visually corresponding to the source page.

### Federal Circuit did not hold that claim survived Step 1

"[U]nder any of these characterizations of the abstract idea, the '399 patent's claims satisfy *Mayo/Alice* step two."

### Claim survived Step 2 because, <u>unlike here</u>, it provided a technical solution to overcome a problem unique to computers that "did not arise in the 'brick and mortar' context":

"[T]hese claims stand apart because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks. In particular, the '399 patent's claims address the problem of retaining website visitors that, if adhering to the routine, conventional functioning of Internet hyperlink protocol, would be instantly transported away from a host's website after 'clicking' on an advertisement and activating a hyperlink. … In more plain language, upon the click of an advertisement for a third-party product displayed on a host's website, the visitor is no longer transported to the third party's website."

### Exemplary way in which the Federal Circuit has distinguished *DDR*:

"The claims in *DDR Holdings* did not relate to a longstanding commercial practice but rather to a business challenge particular to the internet, and the claims did not merely employ conventional techniques to apply an abstract idea but rather involved the use of a computer network operating outside its normal and expected manner."

*cxLoyalty, Inc. v. Maritz Holdings Inc.*, 986 F.3d 1367, 1380 (Fed. Cir. 2021)
see also *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 891 (Fed. Cir. 2019)

# *Enfish* Is Distinguishable

## Representative Claim from *Enfish*

17. A data storage and retrieval system for a computer memory, comprising:

means for configuring said memory according to a logical table, said logical table including:
  a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;
  a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and
means for indexing data stored in said table.

## Claim survived because it was directed to a specific data structure reflected in a specific algorithm:

"Indeed, some improvements in computer-related technology when appropriately claimed are undoubtedly not abstract…."

\*          \*          \*

"Here, the claims are not simply directed to any form of storing tabular data, but instead are specifically directed to a self-referential table for a computer database. For claim 17, this is reflected in step three of the 'means for configuring' algorithm described above."

\*          \*          \*

"In sum, the self-referential table recited in the claims on appeal is a specific type of data structure designed to improve the way a computer stores and retrieves data in memory."

---

"Pursuant to 35 U.S.C. § 112 ¶ 6 (2006), the district court construed the 'means for configuring' language as requiring a four-step algorithm:[3]

1. Create, in a computer memory, a logical table that need not be stored contiguously in the computer memory, the logical table being comprised of rows and columns, the rows corresponding to records, the columns corresponding to fields or attributes, the logical table being capable of storing different kinds of records.

2. Assign each row and column an object identification number (OID) that, when stored as data, can act as a pointer to the associated row or column and that can be of variable length between databases.

3. For each column, store information about that column in one or more rows, rendering the table self-referential, the appending, to the logical table, of new columns that are available for immediate use being possible through the creation of new column definition records.

4. In one or more cells defined by the intersection of the rows and columns, store and access data, which can include structured data, unstructured data, or a pointer to another row."

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-37, 1339 (Fed. Cir. 2016)          43

# *Bascom* Is Distinguishable

## Representative Claim from *Bascom*

1. A content filtering system for filtering content retrieved from an Internet computer network by individual controlled access network accounts, said filtering system comprising:

    a local client computer generating network access requests for said individual controlled access network accounts;

    at least one filtering scheme;

    a plurality of sets of logical filtering elements; and

    a remote ISP server coupled to said client computer and said Internet computer network, said ISP server associating each said network account to at least one filtering scheme and at least one set of filtering elements, said ISP server further receiving said network access requests from said client computer and executing said associated filtering scheme utilizing said associated set of logical filtering elements.

**Failed Step 1 — directed to an abstract idea:**

"An abstract idea on 'an Internet computer network' or on a generic computer is still an abstract idea. *See Intellectual Ventures I*, 792 F.3d at 1368 n. 2 (collecting cases)."

\*      \*      \*

"Here, in contrast, the claims and their specific limitations do not readily lend themselves to a step-one finding that they are directed to a nonabstract idea."

**Survived Step 2 only because the claims required more than performing the abstract idea on generic computer components:**

"The claims do not merely recite the abstract idea of filtering content along with the requirement to perform it on the Internet, or to perform it on a set of generic computer components. Such claims would not contain an inventive concept."

*cited and distinguished in*
**Two-Way Media Ltd. v. Comcast Cable Commc'n's, LLC, 874 F.3d 1329, 1339 (Fed. Cir. 2017)**
**and *Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363 (Fed. Cir. 2019)**

**Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC, 827 F.3d 1341, 1345, 1348-50 (Fed. Cir. 2016)**

44

# *McRO* Is Distinguishable

## Representative Claim from *McRO*

1. A method for automatically animating lip synchronization and facial expression of three-dimensional characters comprising:

    obtaining a first set of rules that define output morph weight set stream as a function of phoneme sequence and time of said phoneme sequence;

    obtaining a timed data file of phonemes having a plurality of sub-sequences;

    generating an intermediate stream of output morph weight sets and a plurality of transition parameters between two adjacent morph weight sets by evaluating said plurality of sub-sequences against said first set of rules;

    generating a final stream of output morph weight sets at a desired frame rate from said intermediate stream of output morph weight sets and said plurality of transition parameters; and

    applying said final stream of output morph weight sets to a sequence of animated characters to produce lip synchronization and facial expression control of said animated characters.

**Survived judgment on the pleadings because the claim was limited to specific rules for computers to create improved animations—unlike Swarm's patents that are not limited to any specific or inventive tasks:**

"Here, the claims are limited to rules with specific characteristics. As the district court recognized during claim construction, 'the claims themselves set out meaningful requirements for the first set of rules: they "define[ ] a morph weight set stream as a function of phoneme sequence and times associated with said phoneme sequence."' They further require 'applying said first set of rules to each sub-sequence ... of timed phonemes.' ...

"The rules are limiting in that they define morph weight sets as a function of the timing of phoneme sub-sequences. Defendants ... argue that the claims here are abstract because they do not claim specific rules. This argument echoes the district court's finding that the claims improperly purport to cover all rules."

"We therefore look to whether the claims in these patents focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery."

*distinguished in Free Stream Media Corp. v. Alphonso Inc., 996 F.3d 1355, 1363 (Fed. Cir. 2021)*

# *Berkheimer* Is Distinguishable

## Claims from *Berkheimer*

**1.** A method of archiving an item comprising in a computer processing system:

presenting the item to a parser;

parsing the item into a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith;

evaluating the object structures in accordance with object structures previously stored in an archive;

presenting an evaluated object structure for manual reconciliation at least where there is a predetermined variance between the object and at least one of a predetermined standard and a user defined rule.

**2.** The method as in claim **1** wherein the respective structure can be manually edited after being presented for reconciliation.

**3.** The method as in claim **1** which includes, before the parsing step, converting an input item to a standardized format for input to the parser.

**4.** The method as in claim **1** which includes storing a reconciled object structure in the archive without substantial redundancy.

## Failed Step 1 – __All__ claims directed to abstract idea:

"Mr. Berkheimer argues that the claims are not abstract because the 'parsing' limitation roots the claims in technology and transforms the data structure from source code to object code. Limiting the invention to a technological environment does 'not make an abstract concept any less abstract under step one.'"

## Claims 1-3 were __not__ patent eligible

**Claim 4 survived Step 2 not simply because it improved computer technology, but rather because the claim required unconventional functionality:**

"According to the specification, conventional digital asset management systems cannot perform one-to-many editing because they store documents with numerous instances of redundant elements, rather than eliminate redundancies through the storage of linked object structures."

*Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367, 1370 (Fed. Cir. 2018) (internal citation omitted)                    46

# *Aatrix* Is Distinguishable

## Representative Claim from *Aatrix*

1. A data processing system for designing, creating, and importing data into, a viewable form viewable by the user of the data processing system, comprising:

(a) a form file that models the physical representation of an original paper form and establishes the calculations and rule conditions required to fill in the viewable form;

(b) a form file creation program that imports a background image from an original form, allows a user to adjust and test-print the background image and compare the alignment of the original form to the background test-print, and creates the form file;

(c) a data file containing data from a user application for populating the viewable form; and

(d) a form viewer program operating on the form file and the data file, to perform calculations, allow the user of the data processing system to review and change the data, and create viewable forms and reports.

## Survived MTD not simply because it improved computer technology, but rather because the claim required inventive computer file and program formats:

"'The inventions claimed in the Aatrix Patents allow data to be imported into the viewable electronic form from outside applications. Prior art forms solutions allowed data to be extracted only from widely available databases with published database schemas, not the proprietary data structures of application software. The inventions of the Aatrix Patents allowed data to be imported from an end user application without needing to know proprietary database schemas and without having to custom program the form files to work with each outside application.  The inventions of the Aatrix Patents permit data to be retrieved from a user application and inserted into a form, eliminating the need for hand typing in the values and eliminating the risk of transcription error.'"

\*          \*          \*

"[N]ot directed to generic components performing conventional activities."

# *Ancora* Is Distinguishable

## Representative Claim from *Ancora*

1. A method of restricting software operation within a license for use with a computer including an erasable, non-volatile memory area of a BIOS of the computer, and a volatile memory area; the method comprising the steps of:

  selecting a program residing in the volatile memory,

  using an agent to ==set up a verification structure in the erasable, non-volatile memory of the BIOS,== the verification structure accommodating data that includes at least ==one license record,==

  verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS, and

  acting on the program according to the verification.

**Survived MTD not simply because it improved computer technology, but rather because the claim required an inventive structure in a specific type of computer memory to address a security problem unique to computer technology:**

**Exemplary way in which the Federal Circuit has distinguished *Ancora*:**

"In *Ancora*, the claimed invention identified a specific technique for addressing the vulnerability of license-authorization software to hacking in an unexpected way—by storing the software license record in the computer's BIOS memory. *Id.* at 1348-49.  …  The claimed invention of the '539 patent, on the other hand, uses a combination of conventional components in a conventional way to achieve an expected result."

*Universal Secure v. Apple Inc.,* 10 F.4th 1342, 1350-51 (Fed. Cir. 2021) (affirming dismissal)

# *Juniper* Ineligibility Decision Would Preclude Swarm Here

**Federal Rule of Civil Procedure 41(b) (Involuntary Dismissal; Effect)**
**"Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule—except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19—operates as an adjudication on the merits"**

*Intellectual Ventures I LLC v. Capital One Fin. Corp.,* 850 F.3d 1332, 1337-38  (Fed. Cir. 2017)
**Issue preclusion barred patent infringement cause of action against one defendant after a different district court granted a different defendant's motion to invalidate the same patent under § 101**

*Collins v. D.R. Horton, Inc.,* 505 F.3d 874, 882-83 (9th Cir. 2007)
**"We have held that a final judgment retains its collateral estoppel effect, if any, while pending appeal"**

*Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.,* 170 F.3d 1373, 1379-82 (Fed. Cir. 1999)

*Sec. People, Inc. v. Medeco Sec. Locks, Inc.,* 59 F. Supp. 2d 1040, 1044-46 (N.D. Cal. 1999), *aff'd,*
243 F.3d 555 (Fed. Cir. 2000) (unpublished table decision)

18A Charles Alan Wright et al. Federal Practice and Procedure § 4433 (3d ed.)

# Stay Pending *Inter Partes* Review Proceedings

## *Parsons Xtreme Golf LLC v. Taylor Made Golf Co.*

"As explained below, the Court will grant Taylor Made's motion to stay. A stay is appropriate because the Patent and Trademark Office has already agreed to conduct *inter partes* review ('IPR') of a substantial majority of the claims at issue, Taylor Made exhibited diligence (both in seeking IPR and in requesting a stay once the IPR process began), the case was in its early stages at the time the stay was requested, and the Court has not yet held *Markman* hearings or set a trial date. Issuing a stay is the norm, rather than the exception, under these circumstances. Additionally, the recent reassignment of this case undermines PXG's argument that a stay would squander the Court's institutional knowledge. It is also relevant that Congress's intent in creating the IPR system was to create an improved process for evaluating patent claims, by allowing subject matter experts to render binding decisions on a relatively expedited and cost-efficient basis. Issuing a stay here—rather than the alternative of requiring the parties to engage in costly, parallel litigation of overlapping issues in two different forums—will best effectuate Congress's intent. *See* Fed. R. Civ. P. 1 (the rules of civil procedure should be construed to promote the 'just, speedy, and inexpensive determination of every action and proceeding')."

Case No. 2:17cv3125-PHX-DWL, 2018 WL 6242280 at *1 (D. Ariz. Nov. 29, 2018)

**Here, Patent Office has instituted *inter partes* review of '004 and '275 patents**

50

# Swarm Has Moved To Amend Claims Of '004 Patent In *Inter Partes* Review Proceeding

**UNITED STATES PATENT AND TRADEMARK OFFICE**

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

JUNIPER NETWORKS, INC.,

Petitioner,

v.

SWARM TECHNOLOGY LLC,

Patent Owner.

*Inter Partes* Review IPR2021-01445
U.S. Patent No. 9,852,004

**PATENT OWNER'S CONTINGENT MOTION TO AMEND
UNDER 37 C.F.R. § 42.121**

Swarm Technology, LLC
Exhibit 2013
001

## Swarm's Motion to Amend In IPR2021-01445

Patent Owner Swarm Technology, LLC ("Patent Owner") hereby submits this Contingent Motion to Amend ("Motion") to the United States Patent Trial and Appeal Board ("Board") under 37 C.F.R. § 42.121. To the extent the Board finds the original Claims 1-2 of U.S. Pat. No. 9,852,004 ("the '004 Patent") (Ex. 1001) unpatentable in this proceeding, Patent Owner respectfully requests that the Board consider this Contingent Motion and grant entry of corresponding substitute Claims 13-14 as set forth in the claim listing found in Appendix A.

**IPR2021-01445 Ex. 2013**

## PTAB Final Written Decision Due by March 2, 2023

# Swarm's Expert Declarations Are Entitled To No Weight
## And, In Any Event, Are Deficient Under *Alice* Step 2

**1** Not part of, or cited in, the proposed Amended Complaint

**2** Conclusory

**3** Supplied by the abstract idea

### Nelson Declaration in Support of Motion for Leave

15. In my opinion, claims 4 and 5 of the '004 Patent include inventive concepts involving more than well-understood, routine, and conventional activities previously known to the industry, including inventive concepts similar to those identified in relation to claim 1. For example, claim 4 is directed to a processing system "wherein the controller and the task pool reside on a *monolithic integrated circuit* (IC), and the first and second co-processors do not reside on the IC," '004 Patent, 15:37-40 (emphasis added), and claim 5 is directed to a processing system "wherein the controller, the task pool, and the first and second co-processors reside on a single monolithic integrated circuit (IC)." '004 Patent, 16:1-3. In view of the foregoing, it is my opinion that claims 4 and 5 of the '004 Patent are directed to non-abstract, inventive concepts that include a chip architecture.

*Doc. 66 Ex. 3 (Nelson Decl.) at ¶ 15*

### Nelson Declaration in Support of Motion for Leave

8. In my opinion, based upon my education and experience, by using the task pool as an intermediary device between the controller and the co-processors, the elements of claim 1, both individually and as a combination, specifically prevent and override the routine and conventional sequence of events performed by conventional or prior art processing architectures. As a result, Claim 1's improvements to multiprocessor functionality can achieve benefits such as "reducing CPU overhead by relieving the CPU of the need to send a request to a cell to retrieve a task from the task pool." '004 Patent, 8:67-9:2. In view of the foregoing, it is my opinion, based on my expertise, that claim 1 of the '004 Patent includes inventive concepts involving more than well-understood, routine, and conventional activities previously known to the field or industry.

*Doc. 66 Ex. 3 (Nelson Decl.) at ¶ 8*

# Swarm's Expert Declarations Are Nearly Identical; Entitled To No Weight And Deficient Under *Alice* Step 2

## Nelson Declaration

**THE '004 PATENT**

5.  In my opinion, based on my expertise, education and experience, the '004 specification correctly points out that a conventional "multiprocessor system includes a central processing unit ("CPU") and one or more co-processors. The CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Completed threads are reported to the CPU, which continues to distribute additional threads to the co-processors as needed." '004 Patent, 1:56-61.

6.  In my opinion, and in my experience, such a conventional multiprocessor system suffers from certain technological drawbacks. The '004 specification rightly identifies that a "significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors." '004 Patent, 1:63-2:1.

7.  In my opinion, and in view of my experience in the field, claim 1 of the '004 Patent describes an unconventional multiprocessor system wherein "a controller" is "configured to populate [a] task pool with a plurality of first tasks and a plurality of second tasks …." '004 Patent, 14:12-13. Claim 1 goes on to describe a first co-processor that is configured to "retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller …." '004 Patent, 14:14-19. Claim 1 describes a second co-processor similar to the first co-processor. The '004 Patent specification supports the controller described by claim 1, describing one embodiment where "the CPU 11 may be configured for use within the system 10 by programming it to recognize and communicate with the task pool 13 and divide the computing requirements into threads …." '004 Patent, 5:40-43.

**Doc. 66-3 (Nelson Decl.) at 5**

## Sylvester Declaration

**THE '004 PATENT**

17.  It is my opinion, based on my review of the foregoing documents and my education and experience, that the '004 specification correctly points out that a conventional "multiprocessor system includes a central processing unit ("CPU") and one or more co-processors. The CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Completed threads are reported to the CPU, which continues to distribute additional threads to the co-processors as needed." '004 Patent, 1:56-61.

18.  It is my opinion, based on my review of the foregoing documents and my education and experience, such a conventional multiprocessor system suffers from certain technological drawbacks. The '004 specification rightly identifies that a "significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors." '004 Patent, 1:63-2:1.

19.  It is my opinion, based on my review of the foregoing documents and my education and experience, that claim 1 of the '004 Patent describes an unconventional multiprocessor system wherein "a controller" is "configured to populate [a] task pool with a plurality of first tasks and a plurality of second tasks …." '004 Patent, 14:12-13. Claim 1 goes on to describe a first co-processor that is configured to "retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller …." '004 Patent, 14:14-19. Claim 1 describes a second co-processor similar to the first co-processor. The '004 Patent specification supports the controller described by claim 1, describing one embodiment where "the CPU 11 may be configured for use within the system 10 by programming it to recognize and communicate with the task pool 13 and divide the computing requirements into threads …." '004 Patent, 5:40-43.

**Doc. 66-4 (Sylvester Decl.) at 6-7**

56

# Swarm's Expert Declarations Are Nearly Identical; Entitled To No Weight And Deficient Under *Alice* Step 2

## Nelson Declaration

**THE '004 PATENT**

5. In my opinion, based on my expertise, education and experience, the '004 specification correctly points out that a conventional "multiprocessor system includes a central processing unit ("CPU") and one or more co-processors. The CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Completed threads are reported to the CPU, which continues to distribute additional threads to the co-processors as needed." '004 Patent, 1:56-61.

6. In my opinion, and in my experience, such a conventional multiprocessor system suffers from certain technological drawbacks. The '004 specification rightly identifies that a "significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors." '004 Patent, 1:63-2:1.

7. In my opinion, and in view of my experience in the field, claim 1 of the '004 Patent describes an unconventional multiprocessor system wherein "a controller" is "configured to populate [a] task pool with a plurality of first tasks and a plurality of second tasks ...." '004 Patent, 14:12-13. Claim 1 goes on to describe a first co-processor that is configured to "retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller ...." '004 Patent, 14:14-19. Claim 1 describes a second co-processor similar to the first co-processor. The '004 Patent specification supports the controller described by claim 1, describing one embodiment where "the CPU 11 may be configured for use within the system 10 by programming it to recognize and communicate with the task pool 13 and divide the computing requirements into threads ...." '004 Patent, 5:40-43.

**Doc. 66-3 (Nelson Decl.) at 5**

## Ashcroft v. Iqbal

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

**556 U.S. 662, 678 (2009)**

## Athena v. Mayo

"In the First Circuit, under Rule 12(b)(6) a district court may generally "consider only facts and documents that are part of or incorporated into the complaint ...."

\* \* \*

We conclude that the district court did not abuse its discretion in declining to consider Athena's expert declaration and convert the motion into one for summary judgment. The declaration does not 'merge into the pleadings,' as the complaint does not reference it or otherwise depend on it."

**915 F.3d 743, 755 (Fed. Cir. 2019) (affirming dismissal under § 101)**